The **STUART–JAMES COMPANY, INCORPORATED**, Plaintiff,

v.

**Albert M. ROSSINI, Caroline Danforth, Basingstoke Holdings, Ltd., Barcan Communications, Inc., AMR Associates, MRO Capital Partners Real Estate, and Ergo Asset Management, Defendants.**

No. 90 C 899.

United States District Court, N.D. Illinois, E.D.

March 13, 1990.

Anton R. Valukas and Daniel R. Warren, Jenner & Block, Chicago, Ill., for plaintiff.

Kenneth Philip Ross, Robert F. Coleman, and Eugene J. Schlitz, Robert F. Coleman & Assoc., Chicago, Ill., for defendants.

## MEMORANDUM OPINION

KOCORAS, District Judge:

This matter is before the court on Defendants Caroline Danforth and Barcan Communications, Incorporated's motion to dismiss this action as it applies to them on the ground that this court lacks personal jurisdiction over them. Plaintiff The Stuart–James Company not only opposes this motion but also itself moves this court to impose Rule 11 sanctions on Danforth and Barcan, claiming that they have made false statements of fact in their pleadings on this issue. Danforth and Barcan, not to be out-done, move for the imposition of sanctions against Stuart–James on similar grounds. For the following reasons, we deny all three motions.

## BACKGROUND

The dispute in this case revolves around certain stock purchases as well as the events following them. During the two-week period beginning January 15, 1990, and ending January 30, 1990, Stuart–James, an investment banking firm, purchased 795,000 shares of Barcan stock on behalf of the holders of various stock accounts. Stuart–James contends that all of the named defendants, working together, fraudulently induced these sales and made other fraudulent misrepresentations in con-

nection with them. In addition, Stuart–James alleges that the defendants failed to pay for the stock as promised. Accordingly, Stuart–James seeks relief under § 10(b) of the Securities Exchange Act of 1934 (codified at 15 U.S.C. § 78j(b) (1988)) and Rule 10b–5 as promulgated thereunder, as well as under the state common law doctrines of fraud and breach of contract pursuant to this court's pendent jurisdiction. Defendants Danforth and Barcan, however, have moved to dismiss, claiming that we have no *in personam* jurisdiction over them.

Stuart–James's complaint alleges the following. On January 15, 1990, Defendant Albert J. Rossini, purporting to be connected with Danforth as well as with Barcan and Defendant Basingstoke Holdings, Ltd, both Canadian corporations, opened a series of accounts with the Illinois office of Stuart–James. Danforth is the president and a director of both Barcan and Basingstoke. These accounts were opened on behalf of various entities, including corporate Defendants Basingstoke, AMR Associates, MRO Capital Partners Real Estate and Ergo Asset Management, as well as on behalf of Rossini himself. Through these accounts, the named entities were entitled to place orders for stock which Stuart–James would then go out and purchase in the market. Once purchased, the owners of the accounts were expected to pay for the stock within a prescribed contractual period.

Beginning on January 15, the day the accounts were opened, the account holders all began placing orders for Barcan stock, although the principal purchases were made through the Basingstoke account. Per their agreement, Stuart–James promptly began to purchase Barcan stock from the marketplace to fill these orders. This buying spree continued until January 30, 1990, when Stuart–James executed its last order for Barcan stock on behalf of the account holders. When the dust had settled, Stuart–James had reason to be concerned: it found itself the owner of 795,000 shares of Barcan stock obtained at a cost of over $550,000, but for which it had not yet received any payment from the account holders. Further, as a result of this massive buying effort, the price of Barcan stock soared from a price of $.27½ per share as of January 15 to $.91 per share on January 30 when the last share was purchased by Stuart–James.

The fact that Stuart–James had not yet received any money, however, was not due to a lack of effort on its part. It had been sent several checks by both Rossini and Danforth, the latter's efforts being taken on behalf of an entity called Argonaut Management, Incorporated. But to date, none of these checks has cleared and the only money that has been paid on this $550,000 debt is $24,000 received by wire transfer.

After trying and failing to obtain payment from Rossini and Danforth amicably, it brought this action on February 15, 1990. The complaint is comprised of three counts. Count I is a securities fraud claim under SEC Rule 10b–5. It alleges that the named defendants were involved in a scheme to manipulate the price of Barcan stock to their advantage and induced Stuart–James to purchase massive quantities of Barcan stock in furtherance of this fraudulent goal. Indeed, Stuart–James contends that the defendants were selling the very shares of Barcan stock which Stuart–James was purchasing in the market for the defendants. Jurisdiction over this federal statutory cause of action is asserted under 15 U.S.C. § 78aa (§ 27 of the SEA) and, of course, 28 U.S.C. § 1331, which provides federal jurisdiction over federal questions generally. Counts II and III are pendent state claims for common law fraud and breach of contract. Stuart–James also asserts the Illinois long-arm statute, presumably as an alternative source for *in personam* jurisdiction over the defendants on the state claims.

Concerned that the defendants would begin disposing of assets as well as selling off Barcan stock in a manner which would destroy its artificially inflated market price, Stuart–James immediately moved for a temporary restraining order enjoining the defendants from accomplishing any of the above-mentioned acts. The motion was

granted as to all named defendants on February 26th and the order's effect has been extended to March 13, 1990.

Defendants Danforth and Barcan, pursuant to Rule 12(b)(2) of the Federal Rules of Civil Procedure, have now moved to dismiss the complaint and dissolve the restraining order as it applies to them on the theory that this court lacks *in personam* jurisdiction over them. Stuart–James not only vigorously opposes this claim but also moves in its response brief for Rule 11 sanctions on the theory that the Danforth and Barcan's motion contains demonstrably false assertions of fact. In their reply brief, Danforth and Barcan make the identical claim against Stuart–James and also move for the imposition of Rule 11 sanctions.

## DISCUSSION

### I.  Personal Jurisdiction

#### A.  *The Legal Standard*

Before reaching the actual issue of whether this court has personal jurisdiction over Danforth and Barcan, we must clarify the statutory source for the assertion of *in personam* jurisdiction and the legal standard under that source. Such clarification is necessary because the movants' entire jurisdictional argument is premised on the assumption that the Illinois long-arm statute governs in this federal securities fraud action with pendent state claims. We find, however, that the Illinois long-arm statute has absolutely no relevance to this case. In addition, we note that even if the long-arm statute did apply, the movants' arguments under it would be inconclusive under the recently-amended version of the provision.

1.  *The Source for Personal Jurisdiction in This Case is 15 U.S.C. § 78aa, Not the Illinois Long–Arm Statute*

Danforth and Barcan's personal jurisdiction argument does not raise a lack of minimum contacts under the fifth amendment; nor does it raise a lack of personal jurisdiction or proper venue under § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa. What it does assert is a lack of personal jurisdiction under the Illinois long-arm statute. Ill.Rev.Stat. ch. 110, § 2–209 (1987). Specifically, the movants claim that Stuart–James has not pled facts which come within any of the five subsections of the long-arm statute as it existed before the amendment of the statute in September of 1989. We find, however, that Illinois' long-arm statute has nothing whatsoever to do with this case.

In the first place, the supremacy clause of the federal constitution forbids the use of the Illinois long-arm statute to narrow the reach of this court's *in personam* on the Rule 10b–5 claim. The Securities Exchange Act, unlike many federal causes of action, does have a provision governing the reach of its mandates and where they may be enforced. *See* 15 U.S.C. § 78aa. Section 78aa clearly provides for nation-wide service of process. Thus, the only limits on the reach of § 78aa are provided by the principles of procedural due process, and in particular minimum contacts, as found in the fifth amendment of the United States Constitution. The constitutional test, moreover, is not that there be minimum contacts with the state in which the federal court hearing the case sits, as it would be when testing the constitutionality of the assertion of personal jurisdiction under a state long-arm provision but, rather, that there be minimum contacts with the United States. *See, e.g., Entek Corp. v. Southwest Pipe & Supply Co.,* 683 F.Supp. 1092, 1099–1103 (N.D.Tex. 1988) (describing generally the applicability of state long-arm statutes in federal question cases, involving both federal statutes which do have nation-wide service of process provisions and those which do not). Although the Illinois long-arm statute might be relevant under Rule 4(e) with respect to *how* service of process was made in this case, neither Danforth nor Barcan has challenged service of process in their pre-answer motion and they therefore have waived any claim in this respect. *See* Rule 12(h).

Furthermore, the Illinois long-arm statute is also irrelevant to establishing

personal jurisdiction over the defendants on the pendent state claims. This is precisely because those state claims are pendent to the federal question, i.e., they arise out of a common nucleus of operative fact. The legal ramification of deeming a state claim "pendent" is that it becomes part of the same "case or controversy" within the meaning of Article III of the Constitution. Since Article III vests this court with the power to decide entire cases, as opposed to just issues, having personal jurisdiction over the defendant for purposes of the federal question automatically vests this court with discretionary jurisdiction over the same defendant for purposes of any truly pendent state claims as well. A contrary conclusion would be inconsistent with the constitutional justification for pendent jurisdiction. The scarce case law available on this interesting point is in complete accord, although not particularly helpful with respect to the reasons for the rule. *GRM v. Equine Investment and Management Group*, 596 F.Supp. 307, 311 (S.D.Tex. 1984); *Oxford First Corp. v. PNC Liquidating Corp.*, 372 F.Supp. 191, 196 n. 15 (E.D.Pa.1974) (grounding its decision on the "considerations of judicial economy and convenience which underlie the pendent jurisdiction doctrine"); *see also* 4 C. Wright & A. Miller, *Federal Practice and Procedure* § 1070, at 416 (2d ed.1987) (citing *Oxford First, supra*). Thus, whether or not the Illinois long-arm would apply to these facts is irrelevant to any issue concerning *in personam* jurisdiction. Instead, the focus must be exclusively on 15 U.S.C. § 78aa.

### 2. *Movants' Argument Under the Illinois Long–Arm is Misplaced in any Event*

■ We also feel the obligation to point out that even if the Illinois long-arm statute was relevant in this case, Danforth and Barcan's argument under Ill.Rev.Stat. ch. 110 § 2–209 is inapposite. The movants' argument is premised entirely on the assumption that the facts of the case must fall within one of the five types of actions to which the statute is directed in order for it to apply. And indeed, this argument would have been possible to make had the

facts giving rise to this litigation arisen before September 7, 1989. *See, e.g., Cook Assocs., Inc. v. Lexington United Corp.*, 87 Ill.2d 190, 197, 57 Ill.Dec. 730, 733, 429 N.E.2d 847, 850 (1981) ("the boundaries or limits under our statute are not to be equated with the 'minimum contacts' test under the [fourteenth amendment's] due process clause").

Effective September 7, 1989, however, the Illinois legislature has amended § 2–209 so that it now reaches the outer limits of the federal constitutional boundary called minimum contacts and fundamental fairness. Where the statute used to state that "[o]nly causes of action arising from acts enumerated herein may be asserted against a defendant in an action in which jurisdiction over him or her is based upon this Section," it now provides that "[a] court may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution or by the Constitution of the United States." Act of Aug. 19, 1989, P.A. 86–840, sec. 1, § 2–209(c), 1989 Ill.Leg.Serv. 4069, 4069 (West). Thus, the movants' insistence that the facts alleged by Stuart–James do not arise under the five acts delineated in § 2–209, even if correct, does not defeat personal jurisdiction here.

Having determined that 15 U.S.C. § 78aa is the proper standard by which to measure Danforth's and Barcan's amenability to suit in this case, we proceed to apply that provision to these facts.

### B. *Personal Jurisdiction Under 15 U.S.C. § 78aa*

■ Venue and statutory personal jurisdiction are coterminous under § 78aa. Section 78aa states that an action under the Securities Exchange Act "may be brought in the district wherein any act or transaction constituting the violation occurred . . . or in the district wherein the defendant is found or is an inhabitant or transacts business." 15 U.S.C. § 78aa. Although Stuart–James has articulated a variety of theories by which personal jurisdiction would be proper under the decisional gloss which has resulted from the courts' interpretations of the statutory language, we

need only discuss Stuart–James's co-conspirator theory in order to find the assertion of personal jurisdiction over Danforth and Barcan to be proper in this case.

An excellent definition of the co-conspirator theory under § 78aa may be found in *Keene Corp. v. Weber*, 394 F.Supp. 787 (S.D.N.Y.1975):

[Venue] and jurisdiction over the person of all knowing participants in an alleged fraud scheme are proper under the federal securities laws as long as one of the participants commits an act in furtherance of the scheme in the forum district. A finding of knowing participation in the scheme may be based upon evidence that another defendant acted within the forum as the absent defendant's representative or agent....

*Id.* at 790–91 (citations omitted). The co-conspirator theory, moreover, has been approved in this district. *Burkhart v. Allson Realty Trust*, 363 F.Supp. 1286, 1292–93 (N.D.Ill.1973).

Under this theory, Stuart–James takes the position that Rossini was acting in this district as an agent of both Danforth and Barcan in a securities fraud scheme. There is no question that Rossini's purported acts were themselves fraudulent, so the only issue is whether Stuart–James has presented sufficient evidence of a connection between Rossini and the movants so as to bring them within the rule.

Before actually examining the evidence presented by Stuart–James, a brief word is in order with respect to the standard of review. Although the burden of proving jurisdiction always lies with the party invoking the federal forum, in order to defeat this motion for lack of personal jurisdiction, Stuart–James "need make only a prima facie showing of jurisdiction in its own affidavits and supporting materials." *E.g., Landry v. Price Waterhouse Chartered Accounts*, 715 F.Supp. 98, 100–01 (S.D.N.Y.1989). Although the movants are free to produce whatever evidence they desire, any conflicts in the evidence concerning this motion must be resolved in favor of the plaintiff. *Turnock v. Cope*, 816 F.2d 332, 333 (7th Cir.1987). With these general principles in mind, we proceed to analyze the evidence presented in this case.

Stuart–James supports jurisdiction over the movants in this case with a great many affidavits and supporting documents. Because we find considerably less than all of this evidence more than sufficient to support jurisdiction under 15 U.S.C. § 78aa, we will not assess every piece of evidence and the arguments made against it. Rather, we simply refer to what we find to be the key facts in the analysis.

It should also be mentioned at this point that the movants do not separate the jurisdictional arguments for Danforth and Barcan but focus almost exclusively on characterizing Danforth's actions as being insufficient to bring her within the reach of this district. They thus appear to concede that if jurisdiction over Danforth is proper, Barcan follows as well. This is consistent with Danforth's heavy reliance on the corporate shield doctrine. Although, based on this court's analysis in Part I of this opinion, this Illinois personal jurisdiction doctrine is not relevant here, by making the argument, the movants concede that Danforth's actions were all taken on behalf of Barcan. We nonetheless refer to evidence submitted by Stuart–James as it applies separately to Barcan and Danforth where such delineation is appropriate.

We find five key pieces of evidence presented by Stuart–James to be dispositive. First, Stuart James has presented evidence that both Danforth and Rossini were key players in Basingstoke, the holder of the account through which the vast majority of Barcan stock was ordered. There is a corporate document which contains Basingstoke's corporate seal and indicates that both Danforth and Rossini served as officers in Basingstoke. The affidavit of Samuel M. Cornelius alleges that Danforth herself sent the document to him on January 17, 1990. Stuart–James has also submitted two checks drawn on Basingstoke's account in Canada: one allegedly signed by Danforth and one signed by Rossini.

Danforth's efforts to negate this evidence and the inference which may be drawn from it is unavailing. Although Danforth contends that the corporate document is a forgery, this merely raises a factual dispute which must be resolved in Stuart–James's favor for purposes of this motion. Moreover, Danforth does not explain how it was that Rossini could have gotten hold of the Basingstoke corporate seal and some blank checks.

Second, Stuart–James has presented a lease for the Skokie office out which Rossini worked that appears to be signed by both Rossini and Danforth. The date on the lease is January 16, 1990, the day after Rossini opened the accounts with Stuart–James. In addition, the Basingstoke check signed by Danforth mentioned above was actually made for the purpose of paying the first month's rent on the lease. With respect to corporate defendant Barcan, it should be noted that the affidavit of Richard Johnson establishes that the telephone number for the Skokie office was listed under the name "Barcan" and Rossini listed Barcan's Vancouver phone number as his business phone when he opened the Stuart–James accounts.

Danforth's attempt to negate the strong inference which may be drawn from this evidence is likewise unavailing. Her response is that her signature on these two documents must have been forged because she never signed them. In further support of this contention, Danforth has submitted the letter of a handwriting analyst giving his expert opinion that the signatures are indeed forged. This, however, only puts the matter in dispute and this dispute must again be resolved in favor of Stuart–James. The handwriting expert's opinion is not conclusive; it is merely evidence that the signatures have been forged.

Third, the Cornelius affidavit also establishes that, on January 22, 1990, he managed to get Rossini and Danforth into a three-way telephone conversation with him. He states that in this conversation Danforth assured him that she would personally see to it that all the orders placed in the accounts opened by Rossini were paid for. He also states that Danforth in no way put him on notice that Rossini was not associated with her or Barcan.

Danforth's response to this evidence is ridiculous. She concedes that the conversation took place but argues that her actions in it are irrelevant because (1) Stuart–James does not allege that it relied on the promise and (2) there was no consideration for the promise. These purported flaws, however, are of no moment. The purpose of the conversation is not to plead and prove an independent fraud or breach of contract claim but to show a connection between Rossini and Danforth. It serves this purpose quite persuasively, movants' observations notwithstanding.

Fourth, Stuart–James presents evidence which directly ties Danforth to the price manipulation scheme. The affidavit of Robert A. Magnan states that Magnan telephoned Danforth several times in early February in an effort to speed up collection on the accounts. In these conversations, Magnan alleges that both Rossini and Danforth told him that Barcan planned to raise the money through a transaction which was contingent on the price of Barcan stock being no lower than $.75 per share. Further, Magnan states that, in a conversation on February 6, 1990, Danforth asked him to refrain from selling off any of the Barcan stock so that the price would not dip below $.75 per share. He alleges that Rossini repeated Danforth's concerns on February 7th in another telephone conversation.

The movants' response to this information is that it is irrelevant because it occurred after all the Barcan stock was purchased. This argument appears to assert the Rule 10b–5 purchaser-seller standing requirement in a jurisdictional context. The argument, however, is misplaced. Stuart–James does not contend that the February conversations constituted actionable fraud under Rule 10b–5; a simple reading of the complaint clarifies this fact. Instead, it takes the position that these conversations support an inference that Danforth, Rossini and Barcan were all involved in a scheme to manipulate the stock

*from the very beginning.* We find that such an inference is warranted here.

Fifth and finally, Stuart–James has presented affidavits which allege that Danforth and Rossini worked together in prior schemes to manipulate Barcan stock. The Richard Berg affidavit states that, in his dealings with Danforth, she continually referred to Rossini as her partner and a fellow director of Barcan. The Edgar Donohoe affidavit alleges an almost identical situation to the one alleged here but in New York. Donohoe claims that his investment banking firm was passed bad checks drawn on a Barcan bank account and signed by Danforth and Rossini to pay for stock accounts which Rossini had opened in the name of Basingstoke.

Danforth and Barcan respond to these two affidavits by claiming that the affiants are lying. Given the standard of review on this motion, the movants apparently believe that they have established the falsity of these affidavits as a matter of law. The main support for this conclusion is a news release issued October 30, 1989, which basically states that Rossini is not an authorized agent of either Barcan or Basingstoke. The release is signed by Danforth in her capacity as director of Barcan. Danforth and Barcan also cite the release as evidence that even Stuart–James should have known of Rossini's fraudulent ways before it went ahead and believed him.

Again, however, the court must remind the movants that the release is, at very best, some evidence either that there was no conspiracy or that any reliance placed on later representations by Rossini was unreasonable. Although the movants are free to argue whatever theories they wish in attempting to avoid liability in this case, a simple reference to a conflict in evidence will never be sufficient to pull them out of the jurisdictional grasp of this court. This is not to even mention the fact that Danforth's post-news release conduct as alleged by Stuart–James appears to be significantly inconsistent with any disavowal.

These pieces of evidence—and we again note that by no means has every bit of evidence presented been discussed—overwhelmingly support an inference that Rossini was acting in concert with Danforth and Barcan when he made all his allegedly fraudulent actions in this district. Construing all facts in favor of Stuart–James, we find that *in personam* jurisdiction over these defendants is proper under 15 U.S.C. § 78aa. This leaves the issue of Rule 11 sanctions.

## II. Rule 11 Sanctions

█ Both sides on this motion have moved for the imposition of Rule 11 sanctions on the grounds that the other has made demonstrably false statements of fact in arguing the merits of the motion to dismiss. We deny both motions as presented.

Stuart–James's motion is based on Danforth and Barcan's statement in its initial motion that Rossini had no authority to act on behalf of Barcan, nor had he ever possessed such authority. The supposed conclusive proof of this statement's falsehood, as put forward by Stuart–James, is the lease for the Skokie, Illinois office signed by Danforth, as Barcan's president, and Rossini, as Barcan's director. Stuart–James also refers the court to the Basingstoke check in payment of the first month's rent on the lease as signed by Danforth.

This "proof" of falsehood, however, is woefully deficient. As described above, the validity of Danforth's signatures on the lease and the check are hotly contested by the movants and a handwriting expert appears to agree with their claim. This is more than sufficient to defeat sanctions on the ground requested.

Not to be outdone, however, Danforth and Barcan claim that Stuart–James made demonstrably false statements in the form of the Donohoe and Berg affidavits. The "proof" of this claim is articulated as the October 30, 1989, news release discussed above and the fact that the movants simply disagree with all the inferences that may be drawn from these affidavits as argued by Stuart–James. This is not demonstrating falsehood by any standard of which this court is aware; it merely indicates disagreement. Although we choose not to impose sanctions *sua sponte* in this case,

we remind Danforth and Barcan that Rule 11 motions are a serious matter and that this court has not hesitated to impose sanctions on attorneys who file such motions without reasonable grounds. *See, e.g., Ratkovich v. Smith Kline and French Laboratories*, No. 88 C 3758, slip op. at 23–25, 1990 WL 17070 (N.D.Ill. Feb. 2, 1990) (Kocoras, J.).

For the foregoing reasons, we deny Danforth and Barcan's motion to dismiss based on a lack of personal jurisdiction as well as the parties' cross-motions for Rule 11 sanctions.