RICHARD T. ALDERSON *et al.*, Plaintiffs-Appellees, v. SOUTHERN COMPANY *et al.*, Defendants-Appellants (Southern Energy North America, Inc., *et al.*, Defendants).

First District (4th Division)   No. 1—99—3015

Opinion filed March 22, 2001.—Rehearing denied May 9, 2001.

834

James A. Klenk, of Sonnenschein, Nath & Rosenthal, of Chicago, and David C. Jensen, Michael E. O'Neill, and John P. Twohy, all of Eichhorn & Eichhorn, of Hammond, Indiana, for appellants.

Kevin P. Durkin, of Clifford Law Offices, of Chicago, for appellees Richard T. Alderson and Robert A. Kallok.

Stephen D. Phillips, of John G. Phillips & Associates, and Robert P. Sheridan, both of Chicago, for appellee Cyril Smotrilla.

David Americus and Bryan E. Curry, both of Gozdecki & Del Guidice, of Chicago, and David K. Lietz, of Coale, Cooley, Lietz, McInerny & Broadus, of Washington, D.C., for appellee David Arcuri.

Joseph P. Sorce and Kirsten M. Dunne, both of Goldberg, Weisman & Cairo, Ltd., of Chicago, for appellee Paul Danielson.

JUSTICE BARTH delivered the opinion of the court:

## I. INTRODUCTION

The appellants in this case are affiliated corporations that allegedly owned, possessed, or operated the premises where the accident giving rise to this dispute occurred. They appeal from the order of the circuit court which denied their motions to dismiss the actions against them for lack of *in personam* jurisdiction. We affirm in part, reverse in part, and remand the cause to the circuit court for further proceedings.

## II. BACKGROUND

The complaints in these consolidated cases stem from injuries plaintiffs Richard T. Alderson, Robert A. Kallok, Cyril Smotrilla, Paul

Danielson, and David Arcuri sustained in a July 28, 1998, coal dust explosion at the State Line Generating Station (Power Plant) in Hammond, Indiana (Hammond). The Power Plant abuts the Indiana-Illinois state line. Plaintiffs are employees of Indiana contractors that were performing services at the Power Plant at the time of the explosion. Alderson, Kallok, Arcuri, and Danielson are Indiana residents.

The complaints name as defendants Southern Company (Southern), Southern Energy, Inc. (Southern Energy), Southern Energy Resources, Inc. (Southern Energy Resources), Southern Energy Trading and Marketing, Inc. (Southern Energy Trading and Marketing), Southern Electric International, Inc. (Southern Electric International), Southern Energy North America, Inc. (Southern Energy North America), State Line Energy, L.L.C. (State Line Energy), SEI State Line, Inc. (SEI), State Line Holding Corp. (State Line Holding), and Commonwealth Edison. Plaintiffs alleged that all defendants other than Commonwealth Edison (hereinafter referred to collectively as defendants) owned and operated the Power Plant on the date of the accident.

The complaints contain counts against defendants sounding in negligence and *res ipsa loquitur* and allege general negligence in the operation and maintenance of the Power Plant. Defendants filed a special appearance and a motion to dismiss for lack of *in personam* jurisdiction. In the motion, defendants asserted that they do not transact business, own property, maintain offices, or have employees in Illinois and attached affidavits of officers or employees to support these assertions.

The trial court granted plaintiffs leave to conduct limited discovery on the issue of jurisdiction before responding to the motion. Discovery revealed the following pertinent facts. Southern is essentially a holding company organized primarily to acquire and hold the securities of electric power, light and gas, and other public utility companies. It is the parent corporation of Southern Energy. Southern Energy North America is a wholly owned subsidiary of Southern Energy. Southern Energy North America owns SEI and State Line Holding. Southern Energy Trading and Marketing was the entity within the Southern organization which facilitated the trading of energy resources among utility companies. According to deposition witnesses, in September 1997, Southern Energy Trading and Marketing merged with another corporation to form Southern Company Energy Marketing. Southern Energy Trading and Marketing maintains a registered agent for service of process in Illinois. Each defendant just described is a Delaware corporation and has its principal office in Georgia.

SEI and State Line Holding own State Line Energy. State Line

Energy is an Indiana limited liability company and owns the power plant and its equipment. State Line Energy has no employees. All personnel at the Power Plant on the date of the accident were employees of Southern Energy Resources. Many of the workers employed at the Power Plant are Illinois residents. As is the case with State Line Energy, most of the Southern entities do not have employees but instead draw their personnel from Southern Energy Resources. A subsidiary of Southern Energy, Southern Energy Resources is a Delaware corporation, has its principal office in Georgia, and maintains a registered agent for service in Illinois. Plaintiffs served summons upon the Illinois registered agents of Southern Energy Trading and Marketing and Southern Energy Resources. With the exception of the suits filed in connection with the July 28, 1998, incident, defendants have never been sued in Illinois.

Pursuant to an asset sale agreement dated April 17, 1996, State Line Energy purchased the Power Plant from Commonwealth Edison Company of Indiana, Inc., a wholly owned subsidiary of Commonwealth Edison. On that same date, State Line Energy executed a power purchase agreement under which it agreed to supply the Power Plant's electrical output exclusively to Commonwealth Edison for 15 years. This agreement required State Line Energy to commit the Power Plant's normal operating capacity, 490 megawatts at the time the parties entered into the agreement, to Commonwealth Edison. The power purchase agreement also granted Commonwealth Edison a right of first refusal regarding any power generated beyond 490 megawatts.

Commonwealth Edison retained title to equipment on the Power Plant premises to enable it to take title to the electricity at that location. It distributed the power from there to its customers. Both the asset sale agreement and the power purchase agreement were executed in Illinois and contained Illinois choice-of-law provisions. The notice provisions in both agreements directed that communications to State Line Energy be sent to the offices of SEI in Georgia.

There are several other agreements that define the relationship between State Line Energy and Commonwealth Edison. Pursuant to a coal supply agreement dated December 29, 1997, Commonwealth Edison agreed to supply all of the coal required to satisfy State Line Energy's obligations under the power purchase agreement. The coal supply agreement contained an Illinois choice-of-law provision, a venue provision designating Illinois as the chosen forum for any action to enforce the provisions of the agreement, and a notice provision providing that communications to State Line Energy be sent to its Hammond, Indiana, address.

A facilities agreement dated December 30, 1997, sets forth State Line Energy's obligations regarding the maintenance of certain equipment at the Power Plant to ensure the reliable delivery of electrical power to Commonwealth Edison. The facilities agreement also provided for a communications link, in the form of a dedicated telephone line, between the Power Plant and Commonwealth Edison offices in Illinois. The purpose of the dedicated line was to allow the parties to the agreement to communicate regarding output requirements and conditions affecting the output or reliability of the Power Plant. The facilities agreement likewise contained an Illinois choice-of-law provision and a notice provision directing that communications to State Line Energy be sent to the offices of SEI in Georgia.

In a consulting services agreement dated January 1, 1998, Commonwealth Edison undertook to provide consulting services to State Line Energy. This agreement contained an Indiana choice-of-law provision and a notice provision directing that any communications to State Line Energy be sent either to a post office box in Chicago or to its Hammond address.

In a training services agreement dated June 10, 1998, Commonwealth Edison agreed to provide emergency response training to State Line Energy at a Commonwealth Edison facility in Illinois. This agreement listed State Line Energy's Chicago post office box address and contained an Illinois choice-of-law provision.

In connection with its purchase of the Power Plant, State Line Energy filed a petition requesting that the Indiana Utility Regulatory Commission (IURC) refrain from asserting jurisdiction over the Power Plant's operation. In the petition, State Line Energy stated that, because of its obligations under the power purchase agreement, it would not be making any sale of power to a retail customer in Indiana or elsewhere. The petition further stated that the "Illinois Commerce Commission is currently conducting hearings on the proposed transaction and impacts in Illinois where most, if not all, of the Plant's output will be utilized. It is not anticipated that any of the Plant's power will be sold or used in Indiana at wholesale or retail." The petition further represented that, as an exempt wholesale generator, State Line Energy was subject to the regulation of the Federal Energy Regulatory Commission and that Illinois, in effect, would review State Line Energy's transactions through its regulation of Commonwealth Edison.[1]

---

[1]State Line Energy asserts that it has never obtained a certificate of public convenience and necessity from the Illinois Commerce Commission which would enable it to transact business in Illinois. See 220 ILCS 5/8—406 (West 1996).

The discovery materials also contain the deposition testimony of several witnesses. In his deposition, Randall Harrison testified that he is employed by Southern Energy Resources. He was one of the employees primarily responsible for overseeing State Line Energy's purchase of the Power Plant. Discovery materials also reveal that, as of October 12, 1998, Harrison was a vice-president of Southern Energy and a vice-president of Southern Energy Resources. Harrison testified that at least part of the transaction required the approval of the Illinois Commerce Commission. It was his belief that State Line Energy's petition to the IURC was unsuccessful. Harrison testified that the asset sale agreement required the approval of the board of directors of SEI and Southern Energy and the finance committee of the Southern board of directors. According to Harrison, SEI functioned as the manager of the Power Plant and oversaw its day-to-day operations.

At the time he was negotiating the purchase of the Power Plant, Harrison was not aware of where the electricity to be sold to Commonwealth Edison would ultimately be consumed. What Commonwealth Edison did with the electricity after purchasing it was not a concern of any of the Southern entities.

Harrison also testified that, in 1993, Southern Energy made a bid to purchase the Fisk generating station in Illinois, but was unsuccessful. In 1995, Southern Energy made an unsuccessful bid to purchase the Kincaid generating station, also in Illinois.[2] At the time Harrison gave the deposition, the Southern companies were considering purchasing other Illinois generating stations from Commonwealth Edison.

Harrison's deposition reveals that he and other employees of the various Southern Companies made several trips to Illinois during the course of the negotiations surrounding the purchase of the Power Plant and in connection with attempts to purchase other Commonwealth Edison generating stations. Harrison's testimony also referenced several trips he and other employees made to Illinois before the accident in this case. The purpose of these trips was to attend meetings or trade conferences which had no bearing on the Power Plant purchase or the Kincaid and Fisk proposals. According to Harrison, these meetings did not relate to any actual business being conducted in Illinois. For example, some of these meetings involved projects or business in other states or abroad.

In his deposition, Alan Harrelson testified that he is an employee

---

[2]Answers to interrogatories state, however, that Southern Electric International was the company that bid on the Kincaid plant.

of Southern Energy Resources and a vice-president of SEI and State Line Holding and has his office in Georgia. Discovery materials reveal that, as of October 12, 1998, Harrelson was a vice-president of Southern Energy and Southern Energy Resources. Harrelson's duties included overseeing the operations of the Power Plant.

Harrelson explained that there were times when the Power Plant's excess capacity was sold to other customers through Southern Company Energy Marketing, the successor-in-interest of Southern Energy Trading and Marketing. Answers to interrogatories reveal that, in July 1998, State Line Energy delivered power to a utility in Ohio. Also in July 1998, State Line Energy sold power to the Illinois Municipal Electric Agency (IMEA). According to answers to interrogatories, IMEA received and took title to the electricity on the Power Plant premises. Harrelson did not know whether any of this excess capacity was ultimately sold or consumed in Illinois. He also explained that the purpose of the consulting services agreement was to help aid in the transition of the Power Plant's ownership by allowing State Line Energy to utilize the knowledge of certain Commonwealth Edison employees regarding the operation of the Power Plant.

Harrelson testified that Southern advertises nationally, including in Illinois, and maintains an Internet site accessible to Illinois residents. When asked why Southern would advertise in Illinois if it claimed that it did not do business there, Harrelson responded that the purpose of the advertising was to build name recognition in the event any Southern companies ever did conduct business in Illinois. It was Harrelson's belief that the explosion caused instability to Commonwealth Edison's system and resulted in some power outages in Illinois.

In his deposition, Thomas Boren testified that he is the president and chief executive officer of Southern Energy. He is also the president of State Line Holding and Southern Electric International and serves on the board of directors of SEI. Discovery materials reveal that, as of October 12, 1998, Boren served as a senior vice-president of Southern and the president and chief executive officer of Southern Energy Resources.

Boren described Southern Energy as an "umbrella" company that holds all of the common stock of about 200 companies. When asked about SEI and State Line Holding, Boren explained that, sometimes, Southern Energy will form a company "just to do bidding," for tax purposes, "and then ultimately we have companies that actually own the assets that we're doing business out of." Boren's involvement in the purchase of the Power Plant was limited to reviewing the investment opportunity in his capacity as president of Southern Energy and

as a member of the Southern Energy board. He did not participate in the negotiations leading to the purchase.

Boren testified that, in the summer of 1998, Southern Company Energy Marketing entered into a power supply contract with the City of Springfield, Illinois (Springfield). However, Springfield defaulted on that contract, and Southern Company Energy Marketing ended up filing suit against Springfield.

At the time of the accident, Sheri Marcelene Fuller was the president of SEI and a vice-president of State Line Holding. She also was a senior vice-president of Southern Energy and Southern Energy Resources. She was on the board of directors of State Line Holding and SEI, a director and executive vice-president of Southern Energy Trading and Marketing, a vice-president of Southern Electric International, and a director and vice-president of Southern Energy North America. In her deposition, Fuller testified that she is currently an employee of Southern Energy Resources and a director of State Line Energy. She also testified that she was the person ultimately in charge of the Power Plant purchase. She has traveled to the Power Plant twice, both times to attend board meetings.

Fuller estimated that she has traveled to Illinois for business reasons approximately 10 times since 1993. She traveled to the Chicago Board of Trade once because Southern Energy was contemplating entering the commodity trading business. She visited the offices of Duff & Phelps, a credit rating agency in Illinois, to obtain a credit rating for Southern Energy. She also visited Chicago on several occasions in connection with the proposed purchase of power plants from Commonwealth Edison. Fuller also attended meetings in Chicago regarding projects in other states or countries.

Fuller testified that, in August 1997, Southern Energy Trading and Marketing contracted for an option to purchase power from Springfield for delivery in Ohio, and vice versa. Southern Company Energy Marketing exercised the option in the summer of 1998, but Springfield failed to deliver the power as requested. According to Fuller, the suit against Springfield was filed in Georgia.

Also, Southern Company Energy Marketing entered into an alliance with Kinder-Morgan, Inc. (Kinder-Morgan), granting Southern Company Energy Marketing access to Kinder-Morgan's facility in Cora, Illinois, to purchase and sell coal. Finally, Fuller was of the belief that the IURC rejected State Line's petition and asserted jurisdiction over the Power Plant.

Steven Owen testified that he is an Illinois resident and an employee of Southern Energy Resources. He was a business unit manager of State Line Energy at the time of the accident. He explained that,

before it purchased the Power Plant, State Line Energy established a Chicago post office box address near the Power Plant. After the purchase, State Line Energy established its official Hammond address. It was Owen's belief that, as of late in June or early in July 1998, State Line no longer maintained the Illinois address. The record contains a memo from Owen to a Commonwealth Edison employee dated June 11, 1998. The memo contains a notice of State Line Energy's change to the Hammond post office box. The letter was printed on State Line Energy's letterhead, which contains the Southern name and logo.

Owen also testified that, in the course of his employment with Southern Energy Resources, he has traveled to Illinois airports and has attended two to three conferences in Illinois. According to Owen, neither Southern nor any of its affiliates maintained a booth at these conferences. Owen's purpose for attending these trips was merely to gather technical information and to network with others in the industry. Also, on three or four occasions, Owen met in Illinois with employees of Commonwealth Edison.

Owen testified that State Line Energy pays $3,672 per month to store 200 to 225 pallet loads of spare parts at Commonwealth Edison's centralized warehouse. He explained that State Line Energy acquired these parts in connection with the purchase of the Power Plant and that it was in the process of moving them to the Power Plant. It was Owen's understanding that State Line Energy did not pay taxes on the spare parts while they were in Illinois but would have to pay a personal property tax once the parts were moved to Indiana. According to Owen, pursuant to the consulting services agreement, Commonwealth Edison has performed services for State Line Energy, such as testing, that took place in Illinois.

According to Owen, the main entrance to the Power Plant lies just on the Indiana side of the state line, and the private road that leads to the main entrance lies partly in Illinois. It was Owen's understanding that State Line Energy possesses an easement over the road to allow access to the main entrance. The Power Plant has a connection to the City of Chicago sewer system, and the Chicago police and fire departments responded on the day of the explosion. Owen estimated that the sale of electricity to Commonwealth Edison accounted for about $20 to $25 million in annual revenue while sales to other utilities generated less than $1 million in annual revenue.

In his deposition, John Long testified that he is a vice-president of Commonwealth Edison and, before the sale, served as an assistant manager and plant manager at the Power Plant. Long confirmed that Commonwealth Edison takes possession of the electricity at the Power

Plant and eventually sells it either to retail or wholesale customers. All of Commonwealth Edison's retail customers are in Illinois. According to Long, the explosion at the Power Plant did not result in any power outages in Illinois, but did cause momentary decreases in voltage across the Commonwealth Edison system.

Long also explained that the Power Plant supplies its own electricity needs as long as it is in service. If the Power Plant were not in service, then Commonwealth Edison would supply the Power Plant with electricity. The electricity Commonwealth Edison supplies to the Power Plant generally originates in Illinois.

Long further testified that fire brigade workers employed at the Power Plant attended fire and emergency training that Commonwealth Edison conducted at one of its Illinois facilities. Commonwealth Edison also provided emission reports to environmental regulatory agencies on behalf of State Line Energy. To compile these reports, Commonwealth Edison employees in Illinois obtained information via modem from monitoring equipment located at the Power Plant.

In his testimony, Long discussed several trips that representatives of various Southern subsidiaries made to Illinois in connection with the purchase of the Power Plant and the proposed purchases of Commonwealth Edison generating stations in Illinois. These trips occurred both before and after the date of the accident. Long also testified that either Southern or one of its affiliated companies had an exhibit at the Edison Electric Institute annual convention in Illinois.

In answers to interrogatories, defendants Southern, Southern Energy, and Southern Energy Resources stated that, between 1993 and June 1998, employees attended 12 trade shows in Illinois. These defendants maintained a booth or exhibit at four of these events. There is no evidence that these defendants actually conducted business at any of these shows.

In a written opinion and order, the trial court granted the motion to dismiss in favor of defendants Southern Electric International and Southern Energy North America but denied the motion with regard to the remaining defendants. The trial court initially found that section 2—209(a) of the Code of Civil Procedure (Code) (735 ILCS 5/2—209(a) (West 1998)) did not provide a basis for asserting *in personam* jurisdiction over any of the defendants because plaintiffs' causes of action did not arise from defendants' alleged transaction of business, ownership, possession, or use of property, or the making of any contract in Illinois.

The trial court next considered whether defendants were subject to *in personam* jurisdiction because they were "doing business" in Il-

linois. See 735 ILCS 5/2—209(b)(4) (West 1998). The court found that, because they had registered agents in Illinois, defendants Southern Energy Resources and Southern Energy Trading and Marketing were subject to *in personam* jurisdiction. The trial court further found that, as the operators of the Power Plant, State Line Energy and SEI were doing business in Illinois because Commonwealth Edison, an Illinois company, purchased essentially all of the Power Plant's output. The court also concluded that asserting *in personam* jurisdiction over State Line Energy and SEI comported with due process principles and, accordingly, that it would be appropriate to assert *in personam* jurisdiction over these defendants pursuant to section 2—209(c) of the Code (735 ILCS 5/2—209(c) (West 1998)).

The trial court also found that it was appropriate to assert *in personam* jurisdiction over Southern, Southern Energy, and State Line Holding under the theory set forth in *Maunder v. DeHavilland Aircraft of Canada, Ltd.*, 112 Ill. App. 3d 879, 445 N.E.2d 1303 (1983), *aff'd*, 102 Ill. 2d 342, 466 N.E.2d 217 (1984). According to the court, these defendants "have organized themselves in such a way as to blur the distinction of separate corporate identities so as to preclude them from asserting that they are separate and distinct corporate identities which prevent the imposition of *in personam* jurisdiction." The court found, however, that plaintiffs failed to establish sufficient affiliating circumstances to enable the court to exercise *in personam* jurisdiction over Southern Electric International and Southern Energy North America.

Southern, Southern Energy, Southern Energy Resources, Southern Energy Trading and Marketing, SEI, State Line Holding, and State Line Energy (appellants) petitioned this court for leave to appeal pursuant to Supreme Court Rule 306(a)(3) (166 Ill. 2d R. 306(a)(3)). We granted the petition.

On August 8, 2000, Commonwealth Edison filed in the circuit court a cross-claim against State Line Energy. In its claim, Commonwealth Edison seeks indemnity pursuant to the coal supply agreement.[3]

## III. DISCUSSION

### A. Request to Strike Appellants' Brief

■ In their reply brief, plaintiffs Alderson, Kallok and Smotrilla have asked this court to strike appellants' brief and dismiss the appeal on the ground that it contains an inadequate statement of facts. These

---

[3]We granted plaintiffs leave to supplement the record on appeal with Commonwealth Edison's cross-complaint.

plaintiffs are correct in noting that appellants' 2¹/₂-page statement of facts omits most of the facts relevant to the issues raised here and essentially contains only those facts which favor appellants' position.

Supreme Court Rule 341(e)(6) requires that an appellant's statement of facts "contain the facts necessary to an understanding of the case, stated accurately and fairly." 166 Ill. 2d R. 341(e)(6). The appellate court has the discretion to strike an appellant's brief and dismiss the appeal as a result of the appellant's failure to provide a complete statement of facts. *Ryan v. Katz*, 234 Ill. App. 3d 536, 537, 600 N.E.2d 1206, 1207 (1992). The inadequate statement of facts in appellants' brief is significant here because the record on appeal is long and the facts are complex. Although appellants' statement of facts is grossly inadequate, this appeal raises significant issues implicating appellants' constitutional rights, and appellants' brief contains a thorough discussion of those issues. For these reasons, we conclude that the interests of justice require an examination of the merits. See *Luttrell v. Panozzo*, 252 Ill. App. 3d 597, 600, 625 N.E.2d 695, 698 (1993) (examining merits of appeal in "interests of justice" despite appellant's failure to present cogent argument).

We caution, however, that our decision not to strike appellants' brief "should not be interpreted as a signal that we are willing, as a matter of course, to overlook violations of the supreme court rules in briefs filed with this court. We are not." *Buckner v. Causey*, 311 Ill. App. 3d 139, 142, 724 N.E.2d 95, 99 (1999). We merely have concluded that the nature of the issues on appeal is such that a review of the merits is warranted.

### B. Section 2—209 of the Code

■ Section 2—209 of the Code states in pertinent part:

"(a) Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person, and, if an individual, his or her personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any of such acts:

(1) The transaction of any business within this State;

(2) The commission of a tortious act within this State;

(3) The ownership, use, or possession of any real estate situated in this State;

\* \* \*

(7) The making or performance of any contract or promise substantially connected with this State;

\* \* \*

(b) A court may exercise jurisdiction in any action arising within or without this State against any person who:

* * *

(4) Is a natural person or corporation doing business within this State.

(c) A court may also exercise jurisdiction on any other basis now or hereafter permitted by the Illinois Constitution and the Constitution of the United States.

* * *

(f) Only causes of action arising from acts enumerated herein may be asserted against a defendant in an action in which jurisdiction over him or her is based upon subsection (a)." 735 ILCS 5/2—209 (West 1998).

## C. Burden of Proof and Standard of Review

■ A plaintiff has the burden of establishing a *prima facie* basis for exercising *in personam* jurisdiction over a defendant. *Kalata v. Healy*, 312 Ill. App. 3d 761, 765, 728 N.E.2d 648, 651-52 (2000); *International Business Machines Corp. v. Martin Property & Casualty Insurance Agency, Inc.*, 281 Ill. App. 3d 854, 857-58, 666 N.E.2d 866, 868 (1996). A plaintiff's *prima facie* case may be overcome by a defendant's uncontradicted evidence that defeats jurisdiction. *Gaidar v. Tippecanoe Distribution Service, Inc.*, 299 Ill. App. 3d 1034, 1041, 702 N.E.2d 316, 320 (1998).

■ When the trial court hears no courtroom testimony and determines jurisdiction solely on the basis of documentary evidence, the trial court is not in a better position than the reviewing court to assess credibility or weigh the evidence. Therefore, in this situation, the standard of review is *de novo*. *Stein v. Rio Parismina Lodge*, 296 Ill. App. 3d 520, 523, 695 N.E.2d 518, 521 (1998); *E.A. Cox Co. v. Road Savers International Corp.*, 271 Ill. App. 3d 144, 148, 648 N.E.2d 271, 275 (1995).

In *Gaidar*, the trial court granted limited discovery on the issue of *in personam* jurisdiction. The discovery materials included deposition testimony. This court determined that, because there were no conflicts in the evidence or credibility determinations to resolve, the trial court had only a question of law before it. Thus, a *de novo* standard of review was appropriate. *Gaidar*, 299 Ill. App. 3d at 1039-40, 702 N.E.2d at 319. Here, there exists no material dispute regarding the facts uncovered during discovery, only the legal conclusions to be drawn from those facts. Accordingly, it is appropriate to review the trial court's ruling *de novo*.

## D. Long-Arm Statute: Section 2—209(a) of the Code

Plaintiffs Alderson, Kallok, and Smotrilla argue that the trial court properly could have asserted jurisdiction over appellants pursu-

ant to section 2—209(a) of the Code. State Line Energy entered into several agreements with Commonwealth Edison in connection with the purchase of the Power Plant. These agreements were executed in Illinois and contained Illinois choice-of-law provisions. Also, to the extent that it possessed easement rights over the road leading to the Power Plant entrance, State Line Energy used or possessed real estate located in Illinois.

■ Where jurisdiction is predicated upon section 2—209(a), only causes of action arising from the enumerated acts may be asserted against a nonresident defendant. 735 ILCS 5/2—209(f) (West 1998). The purpose of the statutory phrase "arising from" is to ensure that there is a close relationship between a cause of action against a nonresident defendant and its jurisdictional activities. *Gaidar*, 299 Ill. App. 3d at 1046, 702 N.E.2d at 157 (plaintiff's cause of action for injuries sustained in Indiana automobile accident did not arise from defendant's transaction of business in Illinois even though defendant's truck had been in Illinois earlier on day of accident). A plaintiff's claim must be one that lies in the wake of commercial activities by which the defendant submitted to the jurisdiction of Illinois. *Kalata*, 312 Ill. App. 3d at 767, 728 N.E.2d at 653.

■ Here, plaintiffs' causes of action do not arise from any of defendants' contracts or transactions in Illinois. Plaintiffs' injuries arise from State Line Energy's operation and maintenance of the Power Plant and not from any acts directly connected with the performance of the agreements with Commonwealth Edison. See, *e.g.*, *Cook Associates, Inc. v. Lexington United Corp.*, 87 Ill. 2d 190, 198-99, 429 N.E.2d 847, 850-51 (1981) (Illinois employment agency's breach of contract action seeking payment of placement commission did not arise out of foreign corporation's activities in Illinois; although corporation interviewed candidate in Illinois initially, candidate rejected offer and later interviewed and accepted offer for different position).

Plaintiffs are not parties to any of the Illinois transactions involving State Line Energy and are not seeking to recover for a breach of any of the agreements underlying these transactions. See, *e.g.*, *D.S. America (East) Inc. v. Elmendorf Grafica, Inc.*, 274 Ill. App. 3d 643, 650-51, 654 N.E.2d 477-78 (1995); *Swissland Packing Co. v. Sherill*, 255 Ill. App. 3d 942, 944, 627 N.E.2d 686, 688 (1994); *G.M. Signs, Inc. v. Kirn Signs, Inc.*, 231 Ill. App. 3d 339, 596 N.E.2d 212 (1992). Instead, plaintiffs are asserting premises liability claims that arose in Indiana and do not arise from any of the Illinois contracts or transactions. See, *e.g.*, *Huffman v. Inland Oil & Transport Co.*, 98 Ill. App. 3d 1010, 1016, 424 N.E.2d 1209, 1214 (1981) (plaintiff's cause of action

for injuries sustained while working on defendant's towboat in Alabama did not arise from commercial activities of defendant in Illinois).

Plaintiffs also contend that their causes of action arise out of the Illinois transactions between State Line Energy and Commonwealth Edison by virtue of the maintenance obligations that the facilities agreement and the coal supply agreement impose upon State Line Energy. In support of their contention, plaintiffs point to Commonwealth Edison's cross-claim against State Line Energy. These considerations do not change our conclusion. The contractual obligations here do not relate to plaintiffs' common-law premises liability claims. Both the facilities agreement and the coal supply agreement contain provisions to the effect that nothing in those agreements shall be construed to create any duty or standard of care with reference to any person who is not a party to those agreements. One of the concepts underlying the "arising out of" analysis is that "individuals and corporations must be able to conduct interstate business confident that transactions in one context will not come back to haunt them unexpectedly in another." *RAR, Inc. v. Turner Diesel, Ltd.*, 107 F.3d 1272, 1278 (7th Cir. 1997). Here, it is not reasonably foreseeable that the individual agreements State Line Energy entered into with Commonwealth Edison would provide the sole basis for an Illinois court to assert *in personam* jurisdiction over State Line Energy for a premises liability action arising in Indiana.

In a similar vein, plaintiffs' causes of action do not arise out of State Line Energy's use of its easement over the Illinois portion of the road leading to the Power Plant. Plaintiffs' actions have no connection to State Line Energy's use of this real estate other than the fact that plaintiffs may have had to use this road to enter the Power Plant on the date of the accident. Plaintiffs sustained their injuries while performing work on the Power Plant premises and not while they were using the road.

For these reasons, the trial court correctly concluded that section 2—209(a) of the Code does not provide a basis for asserting jurisdiction over State Line Energy or any of the other defendants.

### E. Doing Business—Section 2—209(b)(4) of the Code

■ The "doing business" standard is quite high and requires a showing that the defendant is conducting business of such character and extent as to warrant the inference that the corporation has subjected itself to the jurisdiction and laws of the forum. *Cook Associ-*

*ates, Inc.*, 87 Ill. 2d at 201[4]; *Stein*, 296 Ill. App. 3d at 527, 695 N.E.2d at 523; *Natural Gas Pipeline Co. v. Mobil Rocky Mountain, Inc.*, 155 Ill. App. 3d 841, 843, 508 N.E.2d 211, 212 (1986) (*Mobil Rocky Mountain*). The defendant must transact business in Illinois " 'not occasionally or casually, but with a fair measure of permanence and continuity.' " *Stein*, 296 Ill. App. 3d at 527, 695 N.E.2d at 523, quoting *Cook Associates, Inc.*, 87 Ill. 2d at 203, 429 N.E.2d at 853. Thus, the statute requires a "course of business" or "regularity of activities" as opposed to isolated or sporadic acts. *Gaidar*, 299 Ill. App. 3d at 1041, 702 N.E.2d at 320; *Radosta v. Devil's Head Ski Lodge*, 172 Ill. App. 3d 289, 293, 526 N.E.2d 561, 564 (1988). Once the doing business standard is satisfied, the defendant is deemed a resident of Illinois and may be sued on causes of action both related and unrelated to its Illinois activities. *Mobil Rocky Mountain*, 155 Ill. App. 3d at 843, 508 N.E.2d at 212.

■ We begin with an analysis of the activities of State Line Energy and conclude that the undisputed facts affirmatively demonstrate that State Line Energy is "doing business" in Illinois. State Line Energy committed to sell the Power Plant's electrical output to Commonwealth Edison, an Illinois company, for 15 years and derived almost all of its revenue from the sale of electricity to Commonwealth Edison. The contracts establishing this relationship were entered into in Illinois and made subject to Illinois law. As State Line Energy's petition to the IURC reveals, State Line Energy fully realized and anticipated that "most, if not all," of the Power Plant's output would be consumed in Illinois.

State Line Energy relies heavily on the fact that it maintains no offices or sales activities in Illinois, that Commonwealth Edison takes "title" to the electricity in Indiana, and that it has never obtained a certificate of public convenience and necessity from the Illinois Commerce Commission which would enable it to transact business in Illinois. State Line Energy's reliance on these facts ignores the economic reality of its business. Although courts upholding the exercise of *in personam* jurisdiction over foreign corporations pursuant to section 2—209(b)(4) have based their findings on factors such as offices or sales activities in Illinois, each case requires an independent determination of whether, under all of the circumstances, it would be fair to subject a defendant to the jurisdiction of the Illinois courts. *Colletti v. Crudele*, 169 Ill. App. 3d 1068, 1079-81, 523 N.E.2d 1222,

---

[4]The Illinois courts applied the doing-business doctrine before it became a part of section 2—209 effective in 1989. *Gaidar*, 299 Ill. App. 3d at 1041, 702 N.E.2d at 320.

1229 (1988) (Florida trucking company, which made an average of a dozen trips to Illinois per year for local industrial consignees, conducted sufficient in-state activities to subject it to *in personam* jurisdiction under "doing business" doctrine upon claim arising from Kentucky automobile accident).

In *Connelly v. Uniroyal, Inc.*, 75 Ill. 2d 393, 389 N.E.2d 155 (1979), the court held that the substantial profit-making activities of a nonresident manufacturer in Illinois invokes the benefits of the forum state so that, when its goods cause injury because of a defect, Illinois courts will hold the defendant amenable to service of process. *Connelly*, 75 Ill. 2d at 404-06, 389 N.E.2d at 160. In *Connelly*, a tire on an automobile purchased in Illinois caused injury to the plaintiff while he was riding in the automobile in Colorado. The defendant that manufactured the tire was a Belgian corporation with no direct presence in Illinois. It manufactured tires in Belgium and sold them to General Motors in Belgium. General Motors assembled the automobiles in Belgium and shipped them to the United States for distribution. The evidence revealed that, during each of the years in question, between 3,235 and 6,630 automobiles equipped with the defendant's tires were delivered for sale in Illinois. In upholding the exercise of *in personam* jurisdiction over the Belgian manufacturer, the *Connelly* court relied on the fact that its product came into Illinois regularly and in substantial numbers. *Connelly*, 75 Ill. 2d at 406, 389 N.E.2d at 160.

In *Mobil Rocky Mountain*, the court declined to apply *Connelly* outside the context of a product liability action. *Mobil Rocky Mountain*, 155 Ill. App. 3d at 843, 508 N.E.2d at 213. Thus, substantial revenues from sales in Illinois are not enough to satisfy the "doing business" standard in cases not involving product defects. *Rokeby-Johnson v. Derek Bryant Insurance Brokers, Ltd.*, 230 Ill. App. 3d 308, 319, 594 N.E.2d 1190, 1198 (1992).

Because plaintiff's causes of action here do not involve injuries resulting from the sale of State Line Energy's product, the jurisdictional issue presented here does not fall squarely within the framework of *Connelly*. However, in addition to continuous and substantial revenues derived from the sale of its product to an Illinois utility, there exists activity specifically directed toward the Illinois market. State Line Energy has established an essentially exclusive relationship with Commonwealth Edison that, as a practical matter, serves as the basis for its existence. The core purpose of this relationship is to generate electrical power, primarily for ultimate consumption in Illinois. Therefore, this is not a situation where State Line Energy plausibly can claim as fortuitous the fact that the electricity it generates in Indiana ultimately is consumed in Illinois. Also, because the

Power Plant sits on the state line, receives some services from the City of Chicago and Commonwealth Edison, and makes use of an easement in Illinois to facilitate entrance into the Power Plant, State Line Energy is more like a resident of Illinois than most out-of-state businesses. For these reasons, the fact that State Line Energy maintains no offices in Illinois and does not directly deliver its product into Illinois is of less significance. See *Japax, Inc. v. Sodick Co.*, 186 Ill. App. 3d 656, 663-64, 542 N.E.2d 792, 796-97 (1989) (where Japanese manufacturer's products came into Illinois as part of plan to sell regularly in Illinois, manufacturer was "doing business" in Illinois even though products leaving Japanese plant were initially sold in Japan to intermediaries who sold products in United States).

State Line Energy's claim that it lacks a certificate of public convenience and necessity pursuant to section 8—406 of the Public Utilities Act (220 ILCS 5/8—406 (West 1996)) and therefore cannot "do business" in Illinois is unavailing. The Public Utilities Act governs generating facilities within Illinois. 220 ILCS 5/3—105 (West 1996). The purpose of requiring a certificate of public convenience and necessity is to prevent unnecessary duplication of facilities and to protect the public from inadequate service and higher rates resulting from such duplication, while simultaneously protecting a utility against indiscriminate or ruinous competition. *Citizens United for Responsible Energy Development, Inc. v. Illinois Commerce Comm'n*, 285 Ill. App. 3d 82, 89, 673 N.E.2d 1159, 1165 (1996). There is nothing in the Public Utilities Act which forecloses a conclusion that, by delivering electrical power wholesale to an Illinois utility, State Line Energy is "doing business" in Illinois.

Defendants cite to three decisions that merit discussion here. In *Mobil Rocky Mountain*, the defendant was a Delaware corporation with its headquarters in Colorado. The plaintiff was a Delaware corporation that bought and sold natural gas and had its headquarters in Illinois. It entered into a natural gas purchase contract with a supplier, which later assigned its rights under the contract to the defendant. The original parties negotiated and signed the contract outside of Illinois. The contract called for the defendant to deliver the gas to the plaintiff in Wyoming, where title passed. When the market price for natural gas fell below the contract price, the plaintiff brought a declaratory judgment action in Illinois to dispute the quantity term in the contract.

In concluding that the "doing business" standard was not satisfied, the court stated:

> "Defendant never conducted business within Illinois, nor did it maintain offices or employees here. Furthermore, it never solicited

business in Illinois. It merely sold gas to an Illinois resident for distribution in Illinois and presumably elsewhere. Such business activities do not demonstrate that defendant is doing business so that it may be deemed a resident of Illinois. [Citation.] We are not persuaded that by merely delivering gas to a forum plaintiff outside of Illinois pursuant to one contract [defendant] has 'purposefully availed itself of the market for its products' in Illinois." *Mobil Rocky Mountain*, 155 Ill. App. 3d at 845, 508 N.E.2d at 213-14.

*Mobil Rocky Mountain* is distinguishable because, unlike the defendant there, State Line Energy has purposefully directed its activities toward the Illinois market. The power purchase agreement and the other relevant agreements are Illinois contracts. Also absent from *Mobil Rocky Mountain* is the exclusivity present here: State Line Energy has committed to sell the Power Plant's base output to an Illinois customer.

In *Huck v. Northern Indiana Public Service Co.*, 117 Ill. App. 3d 837, 453 N.E.2d 1365 (1983), the plaintiffs were injured in Indiana when the antenna on which they were working came into contact with a power line through which the defendant's electricity flowed. The defendant (NIPSCO) maintained no offices, solicited no business, and had no employees, agents or customers in Illinois.

Pursuant to an interconnection agreement with Commonwealth Edison and Commonwealth Edison Company of Indiana, "NIPSCO will on occasion buy, sell, or interchange power with [Commonwealth Edison] which will utilize the [Commonwealth Edison Company of Indiana] transmission facilities for delivery or receipt of this electric power within the state of Indiana." *Huck*, 117 Ill. App. 3d at 841, 453 N.E.2d at 1369. NIPSCO's physical plant and equipment dedicated to its arrangement with Commonwealth Edison were located entirely in Indiana. The electricity that defendant supplied to Commonwealth Edison "might" move into Illinois through equipment owned by others in Illinois. Also, the defendant purchased 40% to 50% of its coal from Illinois and used trains leased from an Illinois company to transport the coal, used Illinois banks, owned natural gas pipelines in Indiana that connected to pipelines in Illinois, and used Illinois radio and television stations to advertise.

The court found that these contacts did not rise to the level of "doing business." It also found that no substantial ongoing business contacts between the defendant and Illinois existed as a result of the interconnection agreement. *Huck*, 117 Ill. App. 3d at 841, 453 N.E.2d at 1368-69. There is nothing in the court's recitation of the facts in *Huck* that suggests NIPSCO maintained the continuous business contacts with Illinois that are present here. To the contrary, the evi-

dence was that, "on occasion," NIPSCO sold power to Commonwealth Edison. Accordingly, *Huck* is distinguishable from this case.

For the same reasons, *Stephens v. Northern Indiana Public Service Co.*, 87 Ill. App. 3d 961, 409 N.E.2d 423 (1980), which also involved NIPSCO and a similar interconnection agreement, is distinguishable. Additionally, in *Stephens*, the interconnection agreement was between NIPSCO and Commonwealth Edison Company of Indiana. As a result, Commonwealth Edison received power from NIPSCO indirectly. *Stephens*, 87 Ill. App. 3d at 968-69, 409 N.E.2d at 428.

Although we find that State Line Energy was "doing business" in Illinois, the Illinois activities of the remaining defendants, when viewed apart from the activities of State Line Energy, do not rise to the level of "doing business" in Illinois.[5] The trial court relied solely on plaintiffs' service upon an Illinois registered agent to assert *in personam* jurisdiction over Southern Energy Trading and Marketing and Southern Energy Resources. The designation of an Illinois registered agent is not an independently determinative factor, however, in determining whether a foreign corporation is doing business in Illinois. *Colletti*, 169 Ill. App. 3d at 1080, 523 N.E.2d at 1230. There is nothing in section 2—209 of the Code that supports asserting *in personam* jurisdiction over a corporate defendant simply because the plaintiff served summons upon the defendant's Illinois registered agent.

The primary Illinois contacts attributable to other defendants are trips to Illinois in connection with proposed business ventures, attendance at trade shows, and advertising. Transient contact, such as attendance at trade shows, advertising, or mere solicitation, has been rejected as a jurisdictional basis under section 2—209(b)(4). *Cook Associates, Inc.*, 87 Ill. 2d at 203, 429 N.E.2d at 853; *Kadala v. Cunard Lines, Ltd.*, 226 Ill. App. 3d 302, 315, 589 N.E.2d 802, 810 (1992); *Radosta*, 172 Ill. App. 3d at 295, 526 N.E.2d at 565. Therefore, these contacts clearly do not rise to the level of "doing business."

The other relevant contacts here involve Southern Energy Trading and Marketing, namely, its arrangements with Springfield and Kinder Morgan. However, Southern Energy Trading and Marketing exercised its option with Springfield only once, and the record contains no evidence regarding the extent of its dealings with Kinder Morgan. Therefore, these facts do not support a conclusion that Southern Energy Trading and Marketing was conducting business in Illinois

[5]Because plaintiffs have not cross-appealed the dismissals of Southern Electric International and Southern Energy North America, we make no findings regarding these defendants.

with sufficient regularity to warrant a finding that it was "doing business."

## F. Maunder v. DeHavilland Aircraft of Canada, Ltd.

We next consider whether it would be appropriate to assert jurisdiction over any of the appellants other than State Line Energy under the theory recognized in *Maunder v. DeHavilland Aircraft of Canada, Ltd.*, 102 Ill. 2d 342, 466 N.E.2d 217 (1984). The trial court concluded that certain defendants organized themselves so as to "blur the distinction of separate corporate identities." This is not the determinative factor in *Maunder*, however.

■ The theory underlying *Maunder* is that, if a subsidiary corporation is acting as the parent corporation's Illinois agent in the sense of conducting the parent's business rather than its own, then it is appropriate to assert jurisdiction over the parent. Parents of wholly-owned subsidiaries necessarily control, direct, and supervise subsidiaries to some extent. If, however, the subsidiary is conducting its own business, then an Illinois court may not assert *in personam* jurisdiction over the parent simply because it is the parent. *IDS Life Insurance Co. v. SunAmerica Life Insurance Co.*, 136 F.3d 537, 540-41 (7th Cir. 1998). Also, standing alone, the existence of common officers or directors serving both corporations is not sufficient to confer jurisdiction over a nonresident parent corporation. *People v. Parsons Co.*, 122 Ill. App. 3d 590, 598, 461 N.E.2d 658, 664 (1984).

In *Maunder*, the plaintiffs were injured when an airplane manufactured by the defendant, a Canadian corporation, crashed in Africa. The defendant's wholly owned subsidiary was a Delaware corporation with its principal office in Illinois. The subsidiary sold and distributed parts for airplanes manufactured by defendant and was the defendant's only distributor in the United States. The defendant and the subsidiary shared most of their officers and used a combined financial statement. The court held that the defendant was "doing business" in Illinois through its subsidiary. *Maunder*, 102 Ill. 2d at 352, 466 N.E.2d at 770. In reaching the same conclusion, the appellate court in *Maunder* stated:

"Defendant regularly and systematically reaped substantial profits through the sale of its parts by its Illinois subsidiary. *** In light of the control exercised by defendant over [the subsidiary,] coupled with its own activities directed at promoting the sale of its product in Illinois, we hold that defendant is actively and systematically doing business in Illinois and is therefore subject to the jurisdiction of Illinois courts." *Maunder v. DeHavilland Aircraft of Canada, Ltd.*, 112 Ill. App. 3d 879, 883, 445 N.E.2d 1303, 1306 (1983), *aff'd*, 102 Ill. 2d 342, 466 N.E.2d 217 (1984).

■ Here, the evidence discloses that, as an owner of State Line Energy, SEI functioned as the manager of the Power Plant and oversaw its day-to-day operations. There is no indication that SEI existed for any other purpose. Therefore, pursuant to *Maunder*, SEI clearly was doing business in Illinois through State Line Energy. The same conclusion obtains with regard to State Line Holding. Harrelson testified that he was a vice-president of both SEI and State Line Holding and that his duties included overseeing the operations of the power plant. As is the case with SEI, there is no indication that State Line Holding existed for any purpose other than to hold the assets and oversee the operation of State Line Energy.

The evidence also warrants a conclusion that Southern and Southern Energy were doing business through State Line Energy. Southern is merely a holding company that has established many subsidiaries to carry out its business. The appearance of the Southern name and logo on State Line Energy's letterhead amply demonstrates this fact. Also telling is Southern's practice of conducting national name-recognition advertising, apparently on behalf of Southern subsidiaries operating in various regions.

Similarly, Southern Energy is primarily a holding company doing business through its subsidiaries. As the testimony of Boren, the president of Southern Energy, reveals, Southern Energy is an "umbrella company" and many of the subsidiary corporations were formed simply to bid on projects or investments, merely for tax purposes, or to own the assets that "we're doing business out of." State Line Energy certainly fits the profile of a subsidiary formed for this purpose.

There is additional evidence of the control that Southern and Southern Energy exerted over State Line Energy. Harrison was a vice-president of Southern Energy and one of the parties primarily responsible for the purchase of the Power Plant. A further indication of control is that the purchase required the approval of the board of directors of Southern Energy and the finance committee of the Southern board of directors. Viewed as a whole, the evidence affirmatively demonstrates that State Line Energy was a "conduit" through which Southern and Southern Energy did business. See *Parsons Co.*, 122 Ill. App. 3d at 598, 461 N.E.2d at 664.

We believe that applying *Maunder* to Southern, Southern Energy, State Line Holding, and SEI is consistent with the principle underlying that decision, namely, that "a corporation should not be able to insulate itself from the jurisdiction of the states in which it does business by the simple expedient of separately incorporating its sales force and other operations in each state." *IDS Life Insurance Co.*, 136 F.3d at 541.

Because we have concluded the trial court erroneously found that Southern Energy Resources and Southern Energy Trading and Marketing were "doing business" in Illinois, we briefly consider whether it would be appropriate to apply *Maunder* to these defendants. Because these two defendants are not parent corporations of State Line Energy, they do not fit within the *Maunder* framework. Southern Energy Resources supplies State Line Energy with all of its employees. Southern Energy Trading and Marketing acts in the capacity of a broker and on occasion sells electricity generated at the Power Plant. Unlike a parent corporation such as Southern, neither Southern Energy Resources nor Southern Energy Trading and Marketing is using State Line Energy as a means for generating revenue through the sale of electricity in a specified market. Therefore, despite the close functional relationship existing between these corporate entities, there is no basis for a conclusion that either Southern Energy Resources or Southern Energy Trading and Marketing is doing business through State Line Energy.

### G. Section 2—209(c) of the Code—Due Process

The legislature added subsection (c) to section 2—209 of the Code in 1989. Illinois courts have treated section 2—209(c) as an independent basis for asserting *in personam* jurisdiction over a defendant. *Flint v. Court Appointed Special Advocates of Du Page County, Inc.*, 285 Ill. App. 3d 152, 165, 674 N.E.2d 831, 841 (1996); *Allerion, Inc. v. Nueva Icacos, S.A.*, 283 Ill. App. 3d 40, 47, 669 N.E.2d 1158, 1163 (1996). Thus, an Illinois court may exercise personal jurisdiction over a nonresident defendant as long as the exercise of such jurisdiction offends neither federal nor state guarantees of due process.

Federal due process requires that, in order to exercise *in personam* jurisdiction over a nonresident defendant, it is necessary that the defendant have certain "minimum contacts" with the forum state such that the maintenance of the suit there does not offend " 'traditional notions of fair play and substantial justice.' " *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158 (1945), quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 85 L. Ed. 278, 283, 61 S. Ct. 339, 343 (1940). Those minimum contacts must have a basis in " 'some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " *Asahi Metal Industry Co. v. Superior Court of California*, 480 U.S. 102, 109, 94 L. Ed. 2d 92, 102, 107 S. Ct. 1026, 1030 (1987), quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475, 85 L. Ed. 2d 528, 542, 105 S. Ct. 2174, 2183 (1985). Satisfaction of this requirement ensures that an

alien defendant will not be forced to litigate in a distant or inconvenient forum solely as a result of random, fortuitous, or attenuated contacts, or the unilateral act of a consumer or some other third person. *Burger King Corp.*, 471 U.S. at 475, 85 L. Ed. 2d at 542, 105 S. Ct. at 2183.

■ A court conducting a federal due process analysis must consider whether (1) the nonresident defendant had "minimum contacts" with the forum state such that there was "fair warning" that the nonresident defendant may be hailed into a forum court; (2) the action arose out of or related to the defendant's contacts with the forum state; and (3) it is reasonable to require the defendant to litigate in the forum state. *Burger King Corp.*, 471 U.S. at 471-77, 85 L. Ed. 2d at 540-44, 105 S. Ct. at 2181-84; *Kalata*, 312 Ill. App. 3d at 768-69, 728 N.E.2d at 654.

■ The "minimum contacts" and "fair warning" requirements are satisfied if the defendant has purposefully directed his activities at Illinois residents, reached out beyond one state to create continuing relationships with citizens of another state, or purposefully derived benefits from its activities within the forum state. *Burger King Corp.*, 471 U.S. at 471-74, 85 L. Ed. 2d at 540-41, 105 S. Ct. at 2181-83; *Kalata*, 312 Ill. App. 3d at 769, 728 N.E.2d at 655. As we discussed in connection with the "doing business" analysis, Southern, Southern Energy, State Line Holding, SEI, and State Line Energy have purposefully directed their activities toward Illinois residents, namely, Commonwealth Edison and its customers, and have reached out to create continuing relationships with those residents. Because these defendants have directed their activities toward the Illinois marketplace and have derived economic benefit as a result of those activities, the fact that the sale of electricity to Commonwealth Edison is technically carried out in Indiana is of no consequence.

■ The meaning of the "minimum contacts" standard depends upon whether the forum asserts "specific" or "general" jurisdiction. Specific jurisdiction refers to jurisdiction over a defendant in a suit "arising out of or related to the defendant's contacts with the forum." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8, 80 L. Ed. 2d 404, 411 n.8, 104 S. Ct. 1868, 1872 n.8 (1984). General jurisdiction refers to suits neither arising out of nor related to the defendant's contacts, and it is permitted only where the defendant has "continuous and systematic general business contacts" with the forum. *Helicopteros*, 466 U.S. at 416, 80 L. Ed. 2d at 412, 104 S. Ct. at 1873.

In specific jurisdiction cases, the action must directly arise out of the contacts between the defendant and the forum. *RAR, Inc.*, 107

F.3d at 1278 (rejecting a "but for" causal analysis). For reasons similar to those we stated in connection with our analysis under section 2—209(a)of the Code, plaintiffs' premises liability actions do not arise directly out of defendants' contacts with Illinois.

■ We conclude, however, that Southern, Southern Energy, State Line Holding, SEI, and State Line Energy have maintained continuous and systematic business contacts with Illinois that support the assertion of general jurisdiction over them. We base our conclusion on many of the same factors supporting our conclusion that these defendants are "doing business" in Illinois. These defendants, through State Line Energy, agreed to commit the Power Plant's normal operating capacity to an Illinois utility exclusively for 15 years. Therefore, their contacts with Illinois cannot be characterized as random, fortuitous, or attenuated. See *Quaker Oats Co. v. Chelsea Industries, Inc.,* 496 F. Supp. 85, 88 (N.D. Ill. 1980) (assertion of jurisdiction over alien corporations in cause arising from out-of-state activities was sufficiently continuous and systematic to satisfy due process concerns where, over period of several years, corporations sold substantial amounts of their products to customers located in Illinois and sent representatives to Illinois on several occasions to meet with customers).

We also find that, in light of their substantial activities directed at the Illinois marketplace, it is reasonable to require these defendants to litigate these actions in Illinois. For these reasons, asserting jurisdiction over Southern, Southern Energy, State Line Holding, SEI, and State Line Energy does not violate federal due process requirements.

We also find that asserting *in personam* jurisdiction over Southern, Southern Energy, State Line Holding, SEI, and State Line Energy is permissible under the Illinois Constitution. Due process in Illinois requires that "[j]urisdiction is to be asserted only when it is fair, just, and reasonable to require a nonresident defendant to defend an action in Illinois, considering the quality and nature of the defendant's acts which occur in Illinois or which affect interests located in Illinois." *Rollins v. Ellwood,* 141 Ill. 2d 244, 275, 565 N.E.2d 1302, 1316 (1990). Through their operation and management of the Power Plant, Southern, Southern Energy, State Line Holding, SEI, and State Line Energy have engaged in economic activities which have a substantial effect upon interests located in Illinois. The record demonstrates that Commonwealth Edison and the Illinois residents it serves are dependent upon the electricity the Power Plant generates. In light of these defendants' substantial connections with Illinois, it is "fair, just, and reasonable" to require them to defend these actions in Illinois.

Finally, we conclude that section 2—209(c) does not provide a

basis for asserting *in personam* jurisdiction over either Southern Energy Resources or Southern Energy Trading and Marketing. The record does not reveal any connection between Southern Energy Resources and Illinois other than the fact that some of its employees happen to reside in Illinois. With regard to Southern Energy Trading and Marketing, the record reveals only sporadic business transactions in Illinois that do not rise to the level of continuous and systematic business contacts. Therefore, to require these two defendants to defend these actions in an Illinois court would not comport with due process principles.

## IV. CONCLUSION

For the foregoing reasons, we conclude that the trial court properly asserted *in personam* jurisdiction over Southern, Southern Energy, State Line Holding, SEI, and State Line Energy. We also conclude, however, that the exercise of *in personam* jurisdiction over Southern Energy Resources and Southern Energy Trading and Marketing was improper. Accordingly, the rulings of the circuit court are affirmed in part and reversed in part, and this cause is remanded for further proceedings consistent with the views expressed herein.

Affirmed in part and reversed in part; cause remanded.

HARTMAN, P.J., and HOFFMAN, J., concur.