(No. 53854.—

COOK ASSOCIATES, INC., Appellant, v. LEXINGTON
UNITED CORPORATION *et al.*, Appellees.

*Opinion filed December 4, 1981.*

Berger, Newmark & Fenchel, of Chicago (Harry D. Lavery and Christopher J. Horvay, of counsel), for appellant.

Joel S. Ostrow, of Chicago, for appellees.

MR. JUSTICE WARD delivered the opinion of the court:

This appeal arises out of an action for breach of contract brought in the circuit court of Cook County. The plaintiff, Cook Associates, an Illinois corporation, brought the action against Lexington United Corporation, a Delaware corporation not licensed to do business in Illinois. Lexington is a dinnerware manufacturer whose principal place of business is St. Louis, Missouri. Lexington filed a special appearance to contest the court's *in personam* jurisdiction (Ill. Rev. Stat. 1977, ch. 110, par. 20), but its motion to quash service of process was denied. Thereafter, Lexington answered, discovery was taken, and subsequently summary judgment was granted in favor of Cook. The appellate court reversed the judgment (86 Ill. App. 3d 909), holding that the circuit court lacked personal jurisdiction over Lexington. Because of the disposition it made, the appellate court did not consider the propriety of the sum-

mary judgment. We granted Cook's petition for leave to appeal.

Cook is an employment agency whose offices are in Chicago. From July 1973 to July 1976, it also maintained a branch office in Massachusetts, which was operated by Edith McIntosh. Cook specializes in the placement of executive and professional employees with employers who pay Cook a fee if a person referred by Cook is hired. On May 12, 1976, Joseph Runza, a Lexington executive, phoned McIntosh, with whom he had done business before, at Cook's Massachusetts office. He requested assistance in filling a sales management position at Lexington. The record is unclear as to the title of the position discussed. It appears that Runza had first described it as "national sales manager" but later changed the description to "field sales manager."

On May 13, 1976, McIntosh sent Runza the names and resumes of some prospective employees, one of whom was Gregg Hoegemeir. Her accompanying letter stated: "As you know from our previous correspondence, these men, like all of our candidates, are being submitted to you upon the understanding that if they are employed, our fee will be paid by you in accordance with the enclosed schedule." Cook's fee schedule indicated its Chicago address on the letterhead, and stated that the fee would be 20% of one year's salary for positions paying $15,000 per year or more. The schedule also stated: "A fee will be due from you as to any applicant you hire within two years of our disclosure of his identity, or of our submission or referral of him, to you."

Runza communicated with Hoegemeir and arranged to meet him in Chicago. Hoegemeir's resume discloses that he was then a regional sales manager for a Chicago manufacturer and that he resided in Ballwin, Missouri. At the meeting, Runza offered Hoegemeir the position of "field sales manager" at an annual salary of $22,000. Hoegemeir rejected the offer, and the record reflects that there were no

further contacts between Lexington and him for several months.

McIntosh's employment by Cook terminated in July 1976. About three months later, she opened her own employment search and placement service in Massachusetts. It appears that soon thereafter, Runza communicated with McIntosh at her home and advised he was seeking a sales manager for Lexington. This time, it appears, the position would be that of "national sales manager" at a salary in excess of $22,000. McIntosh, acting for her own agency, submitted the names of a number of candidates, including that of Hoegemeir. After several interviews with Hoegemeir, Runza offered him the position at a salary of $25,000 and Hoegemeir accepted. The record does not show whether any of the negotiations which led to Hoegemeir's employment took place in Illinois, nor does it make clear where the contract for his employment was made.

Hoegemeir began working for Lexington in December 1976, and Lexington paid McIntosh a $5,000 fee for her services. Cook later became aware of the hiring of Hoegemeir, and it demanded a $5,000 fee, representing 20% of Hoegemeir's starting salary. When Lexington refused to pay the commission, Cook filed the action for breach of contract in July 1977.

Process was served on Lexington's president, Frank Ivitch, when he was attending a trade show in Chicago. Ivitch and several other company officials were appearing in a week-long housewares exhibit of Lexington. Exhibitors were prohibited from selling merchandise at the exhibition. Less than $50,000 in orders was taken by Lexington at the exhibit, according to the answer to an interrogatory, and were later accepted at Lexington's St. Louis office. Officials of Lexington had attended two other trade shows in Chicago in 1976 and 1977. At each of them, a similar volume of orders was received and later accepted.

Lexington's other contacts with Illinois were listed in an

affidavit of Ivitch, and in Lexington's answers to interrogatories. Lexington did not have an office or an employee in this State. It had no Illinois telephone number. It did not advertise in Illinois, except in connection with the trade shows held in Chicago. Lexington merchandise was sold by an independent manufacturer's representative in Illinois to his Illinois accounts. The record does not reflect the volume of those sales. The representative sold merchandise of other manufacturers as well. Working strictly on a commission basis, he received no salary from Lexington. In the year preceding the filing of this action an employee of Lexington accompanied the representative on three or four occasions, but the employee did not make any sales.

The appellate court held, on due process grounds, that the circuit court of Cook County lacked personal jurisdiction over Lexington.

When arguing before the appellate court the parties were not in agreement as to the test or standard to be applied for determining whether there was personal jurisdiction. Lexington submitted that our long-arm statute provides the only means of acquiring jurisdiction over a nonresident corporate defendant. That statute provides in part:

"(1) Any person, whether or not a citizen or resident of this State, who in person or through an agent does any of the acts hereinafter enumerated, thereby submits such person, and if an individual, his personal representative, to the jurisdiction of the courts of this State as to any cause of action arising from the doing of any such acts:

(a) The transaction of any business within this State;

                   \* \* \*

(3) Only causes of action arising from acts enumerated herein may be asserted against a defendant in an action in which jurisdiction over him is based upon this Section.

(4) Nothing herein contained limits or affects the right to serve any process in any other manner now or hereafter provided by law." Ill. Rev. Stat. 1977, ch. 110, par. 17.

Lexington contended that the requirements of the statute were not satisfied, because the action did not arise from "the transaction of any business" by Lexington in Illinois.

Cook, on the other hand, contended that the long-arm statute does not prohibit the acquiring of jurisdiction according to the doing-business doctrine. Under that doctrine, a foreign corporation is deemed to have submitted to our jurisdiction by doing business in Illinois. The nonresident defendant becomes amenable to service as a resident corporation, under section 13.3 of the Civil Practice Act, which states:

"A private corporation may be served (1) by leaving a copy of the process with its registered agent or any officer or agent of said corporation found anywhere in the State; or (2) in any other manner now or hereafter permitted by law. A private corporation may also be notified by publication and mail in like manner and with like effect as individuals." Ill. Rev. Stat. 1977, ch. 110, par. 13.3.

Cook urged that Lexington's contacts with Illinois rendered the corporation subject to the jurisdiction of the circuit court of Cook County under the "doing business" view, or under the due process standard of "minimum contacts."

The appellate court did not bottom its decision on any one of the standards suggested. It stated that "all of the proposed standards are probably one and the same—minimum contacts." (86 Ill. App. 3d 909, 912.) The court concluded that Lexington did not have sufficient contacts with Illinois to allow a suit against it in this State because "there was an insufficient relationship among the defendant, the forum, and the litigation to show that Lexington could have reasonably anticipated being haled into court here to defend this cause of action." 86 Ill. App. 3d 909, 914.

The parties reassert here the jurisdictional arguments that they made to the appellate court. Cook further argues that the appellate court's decision was based on a foreseeability analysis, which it says is invalid under *World Wide Volkswagen Corp.v. Woodson* (1980), 444 U.S. 286, 62 L. Ed. 2d 490, 100 S. Ct. 559.

Under the due process clause of the fourteenth amendment there are limits to which a State is confined in asserting *in personam* jurisdiction over a nonresident corporate defendant. The Supreme Court in *International Shoe Co. v. Washington* (1945), 326 U.S. 310, 316, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158, described the constitutional requirement:

"[D]ue process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' [Citations.] "

It is important to recognize that this due process standard represents only the outer limits beyond which a State may not go to acquire jurisdiction over nonresidents. A State is free to set its own limits in acquiring this jurisdiction within the perimeters allowed by the due process clause. (*Braband v. Beech Aircraft Corp.* (1978), 72 Ill. 2d 548, 556, *cert. denied* (1979), 442 U.S. 928, 61 L. Ed. 2d 296, 99 S. Ct. 2857. See *Perkins v. Benguet Consolidated Mining Co.* (1952), 342 U.S. 437, 448, 96 L. Ed. 485, 494, 72 S. Ct. 413, 420.) We recently stressed that the boundaries or limits under our statute are not to be equated with the "minimum contacts" test under the due process clause. In *Green v. Advance Ross Electronics Corp.* (1981), 86 Ill. 2d 431, 436, we stated, in reference to the Illinois long-arm statute:

"In *Nelson v. Miller* (1957), 11 Ill. 2d 378, 389, this court said that the Illinois long-arm statute reflects a conscious purpose to assert jurisdiction over nonresidents to the extent permitted by the due process

clause. We do not, however, regard this observation as the equivalent of declaring that the construction and application of section 17(1)(b) depend entirely upon decisions determining in what circumstances due process requirements would permit long-arm jurisdiction. Neither do we read *Nelson* to say that in applying section 17(1)(b) we should not construe the meaning and intent of our own statute irrespective of the due process limitations generally applicable to State long-arm statutes. *A statute worded in the way ours is should have a fixed meaning without regard to changing concepts of due process,* except, of course, that an interpretation which renders the statute unconstitutional should be avoided, if possible. Thus, instead of turning to the array of tests which have been articulated to assist in determining whether long-arm statutes as applied exceed permissible constitutional boundaries, we prefer to resolve this appeal by looking to the meaning of our statute." (Emphasis added.)

We conclude that Lexington is not amenable to the jurisdiction of our courts under either the Illinois long-arm statute or under the doctrine of submitting to jurisdiction by virtue of doing business in Illinois.

Lexington is not amenable to service under the long-arm statute because the cause of action did not arise from the transaction of business in Illinois. Cook argues, however, that a contract between Lexington and Cook was formed in Illinois at the time of Hoegemeir's interview with Lexington. Alternatively, it says that this action arose out of Lexington's activities in Illinois because the interview with Hoegemeir in Chicago was an essential first step in a process of negotiations that culminated in the hiring of Hoegemeir. The contentions do not persuade. Hoegemeir rejected the offer of employment when he was interviewed in Illinois, and of course no contract was formed. Too, it cannot be said that the Chicago interview was any part in the negotiations that led to the hiring of Hoegemeir. The positions involved were different. Hoegemeir rejected the position of

field sales manager. He later was hired as national sales manager, but there is no indication whatever in the record that the interview had any influence on his hiring. It was in the fall of 1976 that Runza asked McIntosh, who was then operating her own agency, for prospects to fill the position of national sales manger. There was no communication between Runza and Hoegemeir until McIntosh referred his name to Lexington in behalf of her own agency.

Lexington argues vigorously that the interview in Chicago should not be given any consideration whatever, because the fact that there had been an interview was not revealed to the trial court until after the court had entered summary judgment. We have assumed the interview's pertinency if only for the sake of argument and find it to be without significance here.

Apart from the long-arm statute, jurisdiction may be acquired under the "doing business" rule. If the nonresident corporation is doing business in the forum State it will be considered to have consented to being sued in that State. That rule developed before the Supreme Court adopted the liberal minimum contacts standard in *International Shoe*. In *Pennoyer v. Neff* (1878), 95 U.S. 714, 24 L. Ed. 565, the Supreme Court had held that, consistent with due process, a State could not acquire *in personam* jurisdiction over a nonresident defendant by any means other than through personal service in the forum State, unless the defendant had consented to jurisdiction or appeared in the suit. See generally Murchison, *Jurisdiction Over Persons, Things and Status*, 41 La. L. Rev. 1053, 1053-68 (1981); Annot., 94 L. Ed. 1167 (1949).

The "doing business" approach, however, developed and was accepted as a means to obtain personal jurisdiction over foreign corporations. This court held that a foreign corporation doing business in Illinois was constructively present in this State and its assent to service upon an agent in Illinois could be implied under those circumstances. The

corporation, therefore, could be served personally in Illinois in the same manner as a domestic corporation could be. (See *American Hide & Leather Co. v. Southern Ry. Co.* (1923), 310 Ill. 524; *Booz v. Texas & Pacific Ry. Co.* (1911), 250 Ill. 376.) If the foreign corporation was not doing business in Illinois, even personal service upon an officer of the company who was physically present in this State as a visitor, for example, did not confer jurisdiction over the nonresident. (*Edwards v. Schillinger* (1910), 245 Ill. 231, 240. See *Midland Pacific Ry. Co. v. McDermid* (1878), 91 Ill. 170.) The "doing business" rule was applied in other States as well. The rule was held to satisfy the jurisdictional requirements announced in *Pennoyer*. That was not unexpected, as the court in *Pennoyer* approved the practice of considering a foreign corporation doing business in a State to have consented to be sued in that State. 95 U.S. 714, 735-36, 24 L. Ed. 565, 573. See *International Harvester Co. v. Kentucky* (1914), 234 U.S. 579, 58 L. Ed. 1479, 34 S. Ct. 944; *Philadelphia & Reading Ry. Co. v. McKibbin* (1917), 243 U.S. 264, 61 L. Ed. 710, 37 S. Ct. 280.

The doing-business standard, of course, continues to be used in determining questions of jurisdiction over foreign corporations not licensed in Illinois (*e.g., St. Louis-San Francisco Ry. v. Gitchoff* (1977), 68 Ill. 2d 38), as it was early recognized that the doctrine was not preempted by the long-arm statute. (See *Lindley v. St. Louis-San Francisco Ry. Co.* (7th Cir. 1968), 407 F.2d 639.) In fact, it complements the long-arm statute because if a foreign, unlicensed corporation is found to be doing business in this State, it is amenable to the jurisdiction of courts of Illinois even for causes of action not arising from the defendant's transactions of business in Illinois. See *Hertz Corp. v. Taylor* (1959), 15 Ill. 2d 552.

In *Green v. Advance Ross Electronics Corp.*, from which we have quoted above, we held that the long-arm statute was not to be equated with the standard of due

process. Here we will not equate the doing-business standard with the mere satisfaction of the minimum-contacts requirement for due process. To do so would render the long-arm statute and the doing-business standard meaningless to many corporate defendants, and it would tie our jurisdictional rules to the changing standards for due process.

Examining Lexington's activities according to the doing-business test as applied under decisions of this court, we hold that on the record before us Lexington is not amenable to jurisdiction in Illinois.

There is no all-inclusive test for determining whether a foreign corporation is doing business in this State. In *Pembleton v. Illinois Commercial Men's Association* (1919), 289 Ill. 99, 104, *appeal dismissed* (1920), 253 U.S. 499, 64 L. Ed. 1032, 40 S. Ct. 483, this court stated that, in general, the term means that the corporation is conducting business in Illinois "of such a character and extent as to warrant the inference that the corporation has subjected itself to the jurisdiction and laws of the district in which it is served and in which it is bound to appear when a proper agent has been served with process." That rule has consistently been held as requiring activities greater than solicitation by employees who have only authority to solicit business in this State. *St. Louis-San Francisco Ry. Co. v. Gitchoff* (1977), 68 Ill. 2d 38; *Hertz Corp. v. Taylor* (1959), 15 Ill. 2d 552, 555.

Jurisdiction has been found, however, in a variety of other activities. A foreign railroad with no Illinois trackage was held to be doing business in *St. Louis-San Francisco Ry. Co. v. Gitchoff* (1977), 68 Ill. 2d 38, because it maintained an office in Chicago staffed with employees who solicited business, and another employee spent 60 to 80% of his working time in Illinois coordinating the movements of the defendant's railcars. In *Hertz Corp. v. Taylor* (1959), 15 Ill. 2d 552, a foreign steamship company was held to be doing business where it maintained a Chicago office in which

employees solicited business and sold tickets for the defendant's ships. Earlier, in *American Hide & Leather Co. v. Southern Ry. Co.* (1923), 310 Ill. 524, this court upheld jurisdiction over a foreign railway company which operated 140 miles of track in Illinois.

More recently, in *Connelly v. Uniroyal, Inc.* (1979), 75 Ill. 2d 393, *cert. denied and appeal dismissed* (1980), 444 U.S. 1060, 62 L. Ed. 2d 738, 100 S. Ct. 992, an alien corporation was held to be amenable to Illinois jurisdiction in a product liability action, because the defendant's products regularly entered Illinois in substantial amounts. In *Braband v. Beech Aircraft Corp.* (1978), 72 Ill. 2d 548, *cert. denied* (1979), 442 U.S. 928, 61 L. Ed. 2d 296, 99 S. Ct. 2857, the defendant manufacturer was held to be present and doing business because it maintained a contractual relationship with an Illinois distributor who, subject to inspection by the defendant, was authorized to sell the defendant's products and required to service its products, whether or not they were sold by the distributor. The defendant co-sponsored an Illinois sales program, and its products had been advertised in this State for at least five years.

In the foregoing cases, there was a regularity of activities in Illinois that is absent in the case of Lexington. (See *St. Louis-San Francisco Ry. Co. v. Gitchoff* (1977), 68 Ill. 2d 38, 45 (personal jurisdiction justified because defendant's activities within Illinois "constituted sufficient substantial business"); *Hertz Corp. v. Taylor* (1959), 15 Ill. 2d 552, 554 (assertion of jurisdiction was permissible because facts showed a sufficient "course of business here"); Annot., 12 A.L.R.2d 1439, 1442 (1950) (it appears that isolated or sporadic purchases in the forum by a foreign corporation are not sufficient to constitute doing business for jurisdictional purposes).) Mr. Justice Cardozo, while serving on the New York Court of Appeals, defined "doing business" for jurisdictional purposes as the corporation's operating within

the State "not occasionally or casually, but with a fair measure of permanence and continuity." *Tauza v. Susquehana Coal Co.* (1917), 220 N.Y. 259, 267, 115 N.E. 915, 917. *E.g., McGowan v. Smith* (1981), 52 N.Y.2d 268, 437 N.Y.S.2d 643, 419 N.E.2d 321 (several visits to forum by defendant's representatives to conduct marketing research is not doing business); *Meunier v. Stebo, Inc.* (1971), 38 App. Div. 2d 590, 328 N.Y.S.2d 608 (periodically sending corporate officer into forum on corporate business is not doing business in the forum).

We consider that Lexington was not doing business in Illinois through having an exhibit at three trade shows in Chicago, and its fruitless interview. We note that while Lexington received orders totaling less than $50,000 during each of those trade shows, the record does not show the size of the individual orders. There is no indication whether the persons who ordered merchandise were Illinois residents and that Lexington merchandise was introduced into Illinois. The independent manufacturer's representative resides in Illinois. The scant references to him in the record are inadequate for us to conclude that because of its association with him Lexington should be deemed to have submitted itself to our jurisdiction for all causes of action which might arise in Illinois. In essence, the record contains a statement that the representative sells Lexington's merchandise along with products of other manufacturers. The record does not show how much has been sold through him, and there is no indication of whether the representative is authorized to contract for Lexington or whether he merely transfers orders to Lexington for acceptance. There is no indication of the control, if any, Lexington has over this representative. A Lexington employee accompanied him a few times, but for what purpose the record fails to show. Nor does it disclose what the Lexington employee did on those occasions.

204

For the reasons given, the judgment of the appellate court, which reversed the circuit court's judgment, is affirmed.

*Judgment affirmed.*