MARILYN L. RIEMER *et al.*, Plaintiffs-Appellees, v. KSL RECREATION CORPORATION, Defendant-Appellant.

First District (1st Division)   No. 1—01—4347

Opinion filed March 29, 2004.

Williams, Montgomery & John, Ltd., of Chicago (Alyssa M. Campbell, Bradley C. Nahrstadt, and Lloyd E. Williams, Jr., of counsel), for appellant.

Michael W. Rathsack, of Chicago (Andrew P. Allen and Michael W. Rathsack, of counsel), for appellees.

JUSTICE McBRIDE delivered the opinion of the court:

Illinois residents Marilyn L. Riemer and George Riemer filed this suit on October 20, 2000, seeking damages for personal injuries and loss of consortium, after Marilyn was allegedly struck and injured when a mirror fell from a wall on August 5, 1999, while the Riemers were guests at the Claremont Resort & Spa in California. The sole issue on appeal is whether the circuit court of Cook County correctly determined that the only defendant named in the Riemers' suit, a nonresident corporation, is subject to personal jurisdiction in Illinois because it was "doing business" in Illinois through the sales activities of a subsidiary to a subsidiary corporation. The "doing business" doctrine is codified in section 2—209(b)(4) of the Code of Civil Procedure. 735 ILCS 5/2—209(b)(4) (West 2000). Under the doctrine, a foreign corporation that engages in a continuous and systematic course of business in Illinois becomes subject to the general jurisdiction of its courts and may be called upon to defend suits in the forum even when those suits have no connection with the corporation's activities in Illinois. The circuit court denied defendant's section 2—301 motion to quash service of process and dismiss plaintiffs' cause of action based upon lack of personal jurisdiction. 735 ILCS 5/2—301 (West 2000). This court, however, granted defendant's interlocutory petition for leave to appeal pursuant to Supreme Court Rule 306(a)(3) (166 Ill. 2d R. 306(a)(3)), and we now address its contention that it lacked sufficient business contacts with Illinois to invoke the general jurisdiction of its courts.

Discovery on the issue of jurisdiction revealed the following facts. Defendant KSL Recreation Corporation is a Delaware corporation with its primary place of business in La Quinta, California. Defendant corporation, formed in 1992, specializes in identifying and purchasing resort properties and then selling them to sub-subsidiary or "indirect subsidiary" corporations which operate and manage the properties. In 1993, defendant acquired the Doral Golf Resort & Spa in Miami, Florida, and the La Quinta Resort & Club and PGA West in La Quinta, California. In 1996, defendant acquired the Lake Lanier Islands Resort near Atlanta, Georgia. In 1997, defendant acquired the Grand Traverse Resort & Spa in northwest Michigan near Traverse City, Michigan. In 1998, defendant acquired the Claremont Resort & Spa

near Berkeley, California, and the Grand Wailea Resort Hotel & Spa in Wailea, Maui, Hawaii. Finally, in 2000, defendant acquired the Arizona Biltmore Resort & Spa in Phoenix, Arizona. None of the resort properties are owned, operated, or managed by the defendant corporation, and none of them are located in Illinois. Further, defendant does not own or lease any property in Illinois, it maintains no offices, mailing address, telephone number, or employees in Illinois, it is not licensed to do business in Illinois, and it does not have a registered agent for service of process in Illinois. One of defendant's wholly owned direct subsidiary corporations is KSL Recreation Group.

Direct subsidiary KSL Recreation Group is also a Delaware corporation, which in turn wholly owns at least 26 other Delaware corporations. The sub-subsidiaries include: (a) KSL Claremont Resort, which, since 1998, has owned and operated the facility where Marilyn Riemer is alleged to have been injured in 1999; (b) various corporations which own and operate the five other resort properties and develop and sell surrounding real estate; and (c) KSL Resorts Group, which solicits business for the six resorts. Operating the resorts includes providing lodging, conference services, food and beverages, golf and spa facilities, club memberships, entertainment, and athletics-focused special events.

The sub-subsidiary soliciting business for all of the resorts, KSL Resorts Group, is based in Reston, Virginia, but has regional United States offices, including a midwest location, near Chicago, in Arlington Heights, Illinois.

Defendant's only contacts with Illinois were through the activities of its sub-subsidiary's Illinois office. However, plaintiffs were never solicited by the Illinois office and their stay at the California resort was unrelated to any activity in Illinois. Nevertheless, they served process in December of 2000, on the only employee of the sub-subsidiary's Illinois office, Laura Jean Gydesen.

At a discovery deposition taken on July 19, 2001, Gydesen stated that her employer had existed for about three years and had maintained an Illinois office during that time frame. Gydesen had been in Illinois for approximately 18 months, working as the sub-subsidiary's director of Midwest sales. The Midwest office had been located in Des Plaines, Illinois, but was currently located in her residence in a high-rise apartment building in Arlington Heights, and its mailing address was at an Arlington Heights Mailboxes Etc. location. Her territory included the midwestern states of Illinois, Minnesota, Wisconsin, Nebraska, Iowa, North Dakota, and South Dakota.

Gydesen specified that the only business her employer conducted was soliciting sales for the six resorts and that her only duties were to

solicit sales to groups and meetings. She never solicited individual bookings. She performed her duties through direct contacts, phone campaigns, and trade shows. She did not use telemarketing or advertise through radio or television. She relied on her knowledge of potential clients, and most of her sales efforts went into direct sales calls and trade shows. Two of the four trade shows she attended were in Illinois.

According to defendant's answers to the Riemers' interrogatories, Gydesen had booked a total of 18 events for the six resorts, including one for the Claremont Resort & Spa in April 2001. Gydesen also stated during her deposition that she had generated about $6 million in business for the six resorts during her 18 months in Illinois (between approximately January 2000 and July 2001). The record also includes a Form 10—K Annual Report filed for the fiscal year ending October 31, 2000, by the sales corporation's parent, KSL Recreation Group. The Form 10—K Annual Report indicated that income generated from operating the resorts totaled $69.5 million for the fiscal year ending on October 31, 1999, and $80.1 million for the fiscal year ending on October 31, 2000. It also disclosed that 96% of the revenue derived in fiscal 2000 by intermediate subsidiary KSL Recreation Group "together with its subsidiaries" was attributable to their ownership and management of the resorts, and the remaining 4% of their revenue was attributable to their development and sale of real estate in and around the resorts. The intermediate subsidiary listed its 26 subsidiaries by name, including the sales subsidiary at issue here and multiple subsidiaries associated with each of the six resorts. For example, there were four subsidiaries associated with the hospitality operations and real estate holdings in Michigan, and others associated with the Claremont operations. In the text of its Form 10—K filing, the intermediate subsidiary repeatedly referred to itself and its subsidiaries in the collective, as "the Company," and all of the financial figures disclosed in the Form 10—K were aggregated for "the Company," rather than being broken out by the specific corporations. In the Form 10—K filing, the intermediate subsidiary also made references to the defendant parent corporation, but consistently referred to the defendant parent corporation either by name or as "the Parent," distinguishing it from all of the other KSL corporate entities. Despite these clear and repeated distinctions, the Riemers erroneously suggest to this court, "All of the corporations, parent and subsidiary, are referred to collectively in this [Form 10—K] filing as the 'Company,' " and "The SEC filing lists the corporate officers and directors of the Company (which comprises all the corporate entities) ***." It is apparent, however, that the Riemers' assertions about "the Company" are incor-

rect. The Form 10—K report filed with the Securities and Exchange Commission by the intermediate subsidiary, KSL Recreation Group, does not suggest in any way that the defendant parent corporation, KSL Recreation Corporation, is part of "the Company."

Gydesen also said that sometimes she took part in negotiating room rates or special considerations for a particular group, but that she never executed any contracts. The hotel would send a standard 12- to 15-page contract directly to the client or to Gydesen for delivery to the client, and the hotel would execute the contract and any contract amendments. Further, before Gydesen became the Midwest sales director, she worked at the La Quinta and Grand Wailea resorts, and in those capacities she had executed contracts. No one at KSL Resorts executed contracts.

Gydesen also related that accommodations could be booked through one of the regional sales offices, such as her Midwest office, or directly with a hotel's on-property staff, but if a client booked through the hotel's website, Gydesen would not receive a sales incentive. She had nothing to do with sales over the Internet.

Gydesen was asked about a trade publication which appears to have been the July/August 2000 edition of "Medical Meetings," in which it was reported that Gydesen had been named "director of sales, Midwest" for defendant KSL Recreation Corporation, rather than for sub-subsidiary KSL Resorts Group. The publisher, Adams Business Media, also reported on the appointments and promotions of other individuals in the meeting sales field. Gydesen stated that if a publication had listed her as a director of sales for KSL Recreation Corporation, the publication was incorrect.

Larry E. Lichliter, the "L" in the various KSL corporations, swore in an affidavit that sub-subsidiary KSL Claremont Resort—rather than parent KSL Recreation Corporation—directly owned and operated the Claremont Resort and Spa in California. Lichliter also provided details about the sub-subsidiary responsible for sales for all the resorts, KSL Resorts Group. He swore it had its own corporate charter, maintained its own bank accounts, corporate books and financial statements, had its own tax identification number, and paid its own taxes. He also swore that defendant parent KSL Recreation Corporation did not "exhibit any amount of control" over the internal affairs of sub-subsidiary KSL Resorts Group. Further, sub-subsidiary KSL Resorts Group retained sufficient operating capital, it did not rely on defendant KSL Recreation Corporation to keep its business in operation, and none of its obligations had been guaranteed or co-signed by defendant KSL Recreation Corporation.

In addition to disclosing the intermediate subsidiary's sources of

income, the Form 10—K referenced above also indicated that the various corporations had substantially the same directors and key executive officers. Lichliter, for example, was a founding stockholder of the parent corporation, defendant KSL Recreation Corporation, and had served as a director and its executive vice president since its inception. He was also serving as the chief financial officer and treasurer of the intermediate subsidiary, KSL Recreation Group, and was a director and either president or executive vice president of each of the sub-subsidiaries, including sub-subsidiary KSL Resorts Group.

The intermediate subsidiary's Form 10—K also included a written expense allocation agreement that the intermediate subsidiary and defendant parent corporation had entered into on April 30, 1997. According to agreement, if requested, defendant would provide general business, financial, legal, and tax advice to the intermediate subsidiary and its subsidiaries, and would be compensated for its advice. The agreement had an initial term of one year, but automatically renewed unless terminated on 30 days' notice by either party. There is no indication in the record on appeal that the agreement was ever terminated, and in fact, the Form 10—K disclosed that "the Company," meaning the intermediate subsidiary KSL Recreation Group and its 26 subsidiaries, had expended $9.8 million in expense allocation agreement fees in 1999, and $10.7 million in 2000. As noted above, however, all of the financial figures in the Form 10—K were aggregated for "the Company," and thus the report did not disclose which specific KSL entity or entities had received the defendant parent corporation's advice and paid the resulting fees to the defendant parent corporation.

The intermediate subsidiary's Form 10—K also disclosed that "the Company" had entered into a "tax sharing" agreement with the defendant parent corporation, providing for the parent, the intermediate subsidiary, and the 26 sub-subsidiaries to share current and deferred income tax expenses and benefits. The parent corporation filed consolidated federal and combined state income tax returns which included the subsidiary and sub-subsidiaries. If the defendant parent corporation utilized tax losses of the intermediate subsidiary and sub-subsidiaries, it would compensate them.

The intermediate subsidiary's Form 10—K also made disclosures about its liquidity and capital resources. It indicated that "historically," the intermediate subsidiary and its 26 subsidiaries (or "the Company") had funded their capital and operating requirements with a combination of operating cash flow and borrowing, and equity investments from the defendant parent corporation. It was expected, however, that they would fund their future capital and operating requirements through a combination of borrowing and cash generated from operations.

Finally, discovery also disclosed that some of the corporate entities had Internet addresses. According to Gydesen and pages printed from the Internet, the sub-subsidiary responsible for sales, KSL Resorts Group, maintained a website at kslresorts.com. This site provided information about the resorts it was promoting and links to (a) the resorts' websites, (b) the "Sales Team," and (c) the parent corporation's website at kslrecreation.com. Gydesen's statements about the Internet indicated that the sales team link connected potential clients with hotel on-site staff, rather than with regional sales office personnel such as herself.

After discovery closed, the parties filed written briefs which included the defendant parent's interrogatory answers, Lichliter's affidavit, the intermediate subsidiary's Form 10—K Annual Report, the transcript of Gydesen's deposition, and the printouts from the sub-subsidiary's website. On November 26, 2001, after considering the written briefs and oral arguments, the trial judge found defendant was "doing business" in Illinois. The judge stated there was "no issue" the defendant's sub-subsidiary KSL Resorts Group was "actively 'doing business' in Illinois," because the sub-subsidiary had maintained a sales office in Illinois for three years, Gydesen's position was permanent, Gydesen had generated $6 million in sales, and Gydesen had negotiated sales contracts involving Illinois residents and booked events for the California resort where plaintiff Marilyn Riemer was injured. The judge also stated the only issue to be decided was whether the sub-subsidiary and its California-based parent were insufficiently separate so as to make the parent amenable to suit in Illinois. The judge characterized the relationship between the two corporations as "synergistic," and concluded that based on the six *"Cannon"* factors (*Cannon Manufacturing Co. v. Cudahy Packing Co.*, 267 U.S. 333, 69 L. Ed. 634, 45 S. Ct. 250 (1925)) stated in *Graco, Inc. v. Kremlin, Inc.*, 558 F. Supp. 188 (N.D. Ill. 1982), there were sufficient factual ties between the two entities to warrant exerting personal jurisdiction in Illinois over the parent.

■ The following legal principles are pertinent to KSL Recreation Corporation's appeal from that ruling. A determination of personal jurisdiction based upon only documentary evidence is reviewed *de novo. Alderson v. Southern Co.*, 321 Ill. App. 3d 832, 846, 747 N.E.2d 926, 938 (2001). The plaintiff bears the burden of establishing a *prima facie* basis for exercising personal jurisdiction over a defendant. *Alderson*, 321 Ill. App. 3d at 846, 747 N.E.2d at 938. However, the plaintiff's *prima facie* case may be overcome by uncontradicted evidence that defeats jurisdiction. *Alderson*, 321 Ill. App. 3d at 846, 747 N.E.2d at 938.

34

■ ■ The United States Supreme Court has determined that a state's power to invoke personal jurisdiction over a nonresident defendant is limited by the due process clause of the fourteenth amendment (U.S. Const., amend. XIV). *Maunder v. DeHavilland Aircraft of Canada, Ltd.*, 102 Ill. 2d 342, 348, 466 N.E.2d 217, 220 (1984). Due process requires that if a defendant is not present within the territory, he must have " 'certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice." ' " *Braband v. Beech Aircraft Corp.*, 72 Ill. 2d 548, 553-54, 382 N.E.2d 252, 254 (1978), quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 90 L. Ed. 95, 102, 66 S. Ct. 154, 158 (1945). The defendant's business contacts with the State must be "continuous and systematic" before its courts may exert jurisdiction. *Maunder*, 102 Ill. 2d at 349, 466 N.E.2d at 221, citing *Helicopteros Nacionales de Columbia v. Hall*, 466 U.S. 408, 80 L. Ed. 404, 104 S. Ct. 1868 (1984). Instead of conducting a mechanical or quantitative assessment of a corporation's activities within the state, a court evaluates the quality and nature of the corporation's activities within the state, to determine whether it is reasonable to require the corporation to defend a particular suit within that forum. *Beech Aircraft*, 72 Ill. 2d at 554, 382 N.E.2d at 255, citing *Shaffer v. Heitner*, 433 U.S. 186, 203-04, 53 L. Ed. 2d 683, 697, 97 S. Ct. 2569, 2580 (1977).

" '[T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.' " *Maunder*, 102 Ill. 2d at 348-49, 466 N.E.2d at 220, quoting *International Shoe*, 326 U.S. at 319, 90 L. Ed. at 104, 66 S. Ct. at 160.

■ ■ In addition, in Illinois, a court's assertion of personal jurisdiction over a foreign corporation requires a determination that the corporation was " 'present and doing business' " within Illinois. *Beech Aircraft*, 72 Ill. 2d at 554-55, 382 N.E.2d at 255. The Illinois Supreme Court has repeatedly indicated that there is no precise test for a court to determine whether a foreign corporation is doing business in Illinois and that each case turns on its unique facts. *Beech Aircraft*, 72 Ill. 2d at 555-56, 382 N.E.2d at 255; *Cook Associates, Inc. v. Lexington United Corp.*, 87 Ill. 2d 190, 201, 429 N.E.2d 847, 852 (1981); *Maunder*, 102 Ill. 2d at 351, 466 N.E.2d at 221. The "doing business" standard is quite high (*Alderson*, 321 Ill. App. 3d at 848, 747 N.E.2d at 940;

*Rokeby-Johnson v. Derek Bryant Insurance Brokers, Ltd.*, 230 Ill. App. 3d 308, 318, 594 N.E.2d 1190, 1197 (1992)), and the defendant must carry on business activity within the State " ' "not occasionally or casually, but with a fair measure of permanence and continuity." ' " *Alderson*, 321 Ill. App. 3d at 849, 747 N.E.2d at 940, quoting *Cook Associates*, 87 Ill. 2d at 203, 429 N.E.2d at 853; *Maunder*, 102 Ill. 2d at 351, 466 N.E.2d at 221. In other words, there must be a " 'course of business or "regularity of activities" as opposed to isolated or sporadic acts.' " *Alderson*, 321 Ill. App. 3d at 849, 747 N.E.2d at 940, quoting *Radosta v. Devil's Head Ski Lodge*, 172 Ill. App. 3d 289, 294, 566 N.E.2d 561, 564 (1988). In general, "doing business" means conducting business in Illinois of such a character and to such an extent that it may be inferred that the defendant has subjected itself to the jurisdiction and laws of this state and is bound to appear when properly served. *Alderson*, 321 Ill. App. 3d at 848, 747 N.E.2d at 940; *Cook Associates*, 87 Ill. 2d at 201, 429 N.E.2d at 853. The foreign corporation is considered to be constructively present in Illinois and its assent to service on an agent in Illinois is implied, even for causes of action unrelated to its transactions in Illinois. *Colletti v. Crudele*, 169 Ill. App. 3d 1068, 1078-79, 523 N.E.2d 1222, 1229 (1988), citing *Cook Associates*, 87 Ill. 2d at 199-200, 429 N.E.2d at 851-52. In effect, the foreign corporation has taken up residence in Illinois and, therefore, may be sued on causes of action both related and unrelated to its activities in Illinois. *Alderson*, 321 Ill. App. 3d at 849, 747 N.E.2d at 940. In this regard, the "doing business" doctrine is distinguishable from the long-arm statute, which is not at issue here. The long-arm statute subjects a nonresident to jurisdiction in Illinois if the nonresident has taken certain enumerated acts, such as the transaction of business or the commission of a tortious act in Illinois, and the plaintiff's claim arises from that specific act. 735 ILCS 5/2—209(a), (f) (West 2000). Another way of distinguishing these two concepts is to consider that the "doing business" doctrine results in the assertion of "general" jurisdiction over a corporation, and the long-arm statute results in the assertion of "specific" jurisdiction over a corporation. *Spartan Motors, Inc. v. Lube Power, Inc.*, 337 Ill. App. 3d 556, 561, 786 N.E.2d 613, 618 (2003); *Alderson*, 321 Ill. App. 3d at 857, 747 N.E.2d at 947.

■ In order to determine whether a foreign corporation has established a permanent and continuing relationship with Illinois, a court reviews its contacts with the forum over a continuous period of time rather than a specific, fixed point in time. *Reeves v. Baltimore & Ohio R.R. Co.*, 171 Ill. App. 3d 1021, 1027, 526 N.E.2d 404, 407 (1988). The relevant time period to be reviewed begins approximately when

the claim arose and it extends to when suit was filed and service of process was attempted. *Reeves*, 171 Ill. App. 3d at 1027, 526 N.E.2d at 408. A court should review the contacts over this entire time period; however, the critical point of inquiry is the time the defendant was made a party to the suit and was served. *Reeves*, 171 Ill. App. 3d at 1027, 526 N.E.2d at 408.

■ Although there is no fixed "doing business" test, most Illinois courts finding personal jurisdiction over foreign corporations have based their determinations on facts such as whether the defendant has maintained offices or engaged in sales activities in Illinois. *Huck v. Northern Indiana Public Services Co.*, 117 Ill. App. 3d 837, 840, 453 N.E.2d 1365, 1368 (1983). Notably, mere advertisement, even through the Internet, participation in trade shows, or solicitation by an employee or agent who lacks authority to do more have not been enough to sustain personal jurisdiction in Illinois. *Cook Associates*, 87 Ill. 2d 190, 429 N.E.2d 847 (trade shows); *Radosta*, 172 Ill. App. 3d 289, 526 N.E.2d 561 (trade show and various advertising); *Forrester v. Seven Seventeen HB St. Louis Redevelopment Corp.*, 336 Ill. App. 3d 572, 784 N.E.2d 834 (2002) (telephone book and website advertising); *Kadala v. Cunard Lines, Ltd.*, 226 Ill. App. 3d 302, 315, 589 N.E.2d 802, 810 (1992) (newspaper ads, travel brochures, and solicitation by travel agents); *Dal Ponte v. Northern Manitoba Native Lodges, Inc.*, 220 Ill. App. 3d 878, 581 N.E.2d 329 (1991) (trade shows through agent). Since deriving revenue from Illinois may simply be a consequence of successful solicitation in the forum, even substantial earnings from this state have not been considered indicative of whether a corporation has established a permanent and continuing relationship with the forum. *Hulsey v. Scheidt*, 258 Ill. App. 3d 567, 572-73, 639 N.E.2d 905, 909 (1994) (no court has held revenue is the dispositive variable); *Rokeby-Johnson*, 230 Ill. App. 3d at 319, 594 N.E.2d at 1198 (substantial revenue from sales is not enough to satisfy "doing business" in a contract action); *Kadala*, 226 Ill. App. 3d at 315, 589 N.E.2d at 810 (revenue is a natural result of successful solicitation). Compare *Connelly v. Uniroyal*, 75 Ill. 2d 393, 389 N.E.2d 155 (1979) (products liability action). However, when a foreign corporation engages in more than mere solicitation through its own staff (*St. Louis—San Francisco Ry. Co. v. Gitchoff*, 68 Ill. 2d 38, 369 N.E.2d 52 (1977)), a subsidiary corporation (*Maunder*, 102 Ill. 2d 342, 466 N.E.2d 217), or even an unrelated company (*Beech Aircraft*, 72 Ill. 2d 548, 382 N.E.2d 252), the nature and quality of its contacts with Illinois may be considered significant enough to invoke the jurisdiction of this forum's courts.

Since the present dispute involves subsidiary corporations, the

most relevant Illinois case is *Maunder*, in which it was argued that a Canadian corporation was doing business in Illinois through a wholly owned subsidiary officed outside Chicago, in Rosemont, Illinois. *Maunder*, 102 Ill. 2d at 345, 466 N.E.2d at 219. The Canadian parent designed and manufactured aircraft, and established the Rosemont subsidiary to sell and distribute parts for its planes. *Maunder*, 102 Ill. 2d at 345, 466 N.E.2d at 218-19. The subsidiary's sole function was to sell and distribute those parts. *Maunder v. DeHavilland Aircraft of Canada, Ltd*, 112 Ill. App. 3d 879, 882, 445 N.E.2d 1303, 1306 (1983), *aff'd*, 102 Ill. 2d 342, 466 N.E.2d 217 (1984). In addition, the parent distributed an illustrated parts catalog indicating that its United States customers should send parts orders to the subsidiary in Rosemont, and whenever the parent received parts orders directly, it forwarded them to Rosemont. *Maunder*, 112 Ill. App. 3d at 882, 445 N.E.2d at 1306. The record also showed that print ads which the Canadian parent placed in American aviation journals touted its aircrafts' reliability and simple maintenance, and the availability of parts and service in Rosemont. *Maunder*, 102 Ill. 2d at 347, 466 N.E.2d at 219. The Canadian company not only set up the Illinois subsidiary as its American supply depot, but it also owned all its stock, paid its directors, and guaranteed its lease. *Maunder*, 102 Ill. 2d at 346, 466 N.E.2d at 219. Further, one person was president of both corporations, and all the corporate officers and the manager of the Rosemont facility were accountable to that one individual. *Maunder*, 112 Ill. App. 3d at 883, 445 N.E.2d at 1306. A company manual even stated that the subsidiary was controlled by the Canadian parent, and the record showed the subsidiary's staff placed an average of eight telephone calls per day to the Canadian office. *Maunder*, 102 Ill. 2d at 346, 466 N.E.2d at 219.

When one of the Canadian-made planes crashed in Central Africa, personal injury and wrongful death suits were filed in Cook County and the papers were served on a Rosemont employee. *Maunder*, 102 Ill. 2d at 345, 455 N.E.2d at 218-19. The circuit court was persuaded to dismiss the tort suits for lack of personal jurisdiction, but the appellate court reviewed the Canadian defendant's activities in Illinois and found that jurisdiction was properly exerted. *Maunder*, 112 Ill. App. 3d at 883, 445 N.E.2d at 1306. The court remarked upon the great extent to which the parent controlled the subsidiary and upon the parent's own activities at promoting the sale of its products in Illinois, and concluded that the Canadian company had been "actively and systematically doing business in Illinois" through its Illinois subsidiary. *Maunder*, 112 Ill. App. 3d at 883, 445 N.E.2d at 1306. The supreme court agreed with this assessment (*Maunder*, 102 Ill. 2d at

346, 466 N.E.2d at 219), characterizing the Rosemont office as an "essential component" of the Canadian parent's business activities in Illinois. *Maunder*, 102 Ill. 2d at 350, 466 N.E.2d at 221.

*Maunder* figured prominently in a subsequent court's analysis of whether Delaware corporations that were principally officed in Georgia were doing business in Illinois through the activities of a subsidiary corporation which, at least on paper, owned and operated a coal-fired electric power plant at the Indiana/Illinois border. *Alderson*, 321 Ill. App. 3d 832, 747 N.E.2d. 926. In *Alderson*, the court commented:

"The theory underlying *Maunder* is that, if a subsidiary corporation is acting as the parent corporation's Illinois agent in the sense of conducting the parent's business rather than its own, then it is appropriate to assert jurisdiction over the parent. Parents of wholly-owned subsidiaries necessarily control, direct, and supervise subsidiaries to some extent. If, however, the subsidiary is conducting its own business, then an Illinois court may not assert *in personam* jurisdiction over the parent simply because it is the parent. [Citation.] Also, standing alone, the existence of common officers or directors serving corporations is not sufficient to confer jurisdiction over a nonresident parent corporation. [Citation.]" *Alderson*, 321 Ill. App. 3d at 854, 747 N.E.2d at 944.

The court considered the activities of the various defendant corporations and concluded that the local subsidiary was simply a conduit through which the higher corporate entities were selling electricity, or "doing business," in Illinois. *Alderson*, 321 Ill. App. 3d at 849-55, 747 N.E.2d at 940-46. The evidence disclosed that the most senior corporation was "merely a holding company that has established many subsidiaries to carry out *its* business" (emphasis added) and that the intermediate corporations held the assets, and managed and oversaw day-to-day operations at the power-generating facility. *Alderson*, 321 Ill. App. 3d at 855, 747 N.E.2d at 945. The court emphasized that corporations should not be able to insulate themselves from jurisdiction in a state in which they do business by simply establishing multiple subsidiary corporations. *Alderson*, 321 Ill. App. 3d at 855, 747 N.E.2d at 946. Because the evidence showed the senior corporations actually controlled the power plant, the court concluded they were doing business in Illinois through that local facility and were appropriately subjected to jurisdiction in this forum. *Alderson*, 321 Ill. App. 3d at 855, 747 N.E.2d at 945-46.

Before applying these legal principles to the present dispute, we point out that none of the cases cited above, particularly *Maunder* and *Alderson*, which specifically involve parent and subsidiary corporations, endorse the analytical approach that the trial judge here

employed of first determining whether the local subsidiary was doing business in Illinois. When a court determines whether a foreign corporation is doing business in this state, the question is not whether its local affiliate is doing business in the jurisdiction, but whether the foreign parent is doing business in the jurisdiction *through* its local affiliate. We reiterate the pertinent portions of those cases. In the first *Maunder* appeal, the court indicated that although there is no "all-inclusive test" for determining whether a foreign corporation is doing business in this state, the finding "generally requires that the corporation conducts business in Illinois of such a character and extent as to warrant the inference that it has subjected itself to the jurisdiction and laws of Illinois." *Maunder*, 112 Ill. App. 3d at 882, 445 N.E.2d at 1305. After the supreme court granted leave to appeal, it independently evaluated the "business contacts between Ltd. [the Canadian parent] and the State of Illinois" (*Maunder*, 102 Ill. 2d at 350, 466 N.E.2d at 221) and concluded, "Clearly Ltd. [the Canadian parent] through Inc. [the Rosemont subsidiary] was doing business in Illinois." *Maunder*, 102 Ill. 2d at 352, 466 N.E.2d at 222. Finally, in *Alderson*, the court considered whether multiple parent corporations were doing business in Illinois through the local power plant and concluded the power plant was a " 'conduit' through which [the parent corporations] did business [in Illinois.]" *Alderson*, 321 Ill. App. 3d at 855, 747 N.E.2d at 946. In these cases, the dispositive inquiry was the extent to which the foreign parent was controlling and, thus, doing business in Illinois through a local subordinate entity.

The two *Maunder* opinions are also significant here because both courts discredited the *Cannon* rationale, which was at the heart of the trial judge's determination that there were sufficient ties between the Illinois and California KSL entities to exert personal jurisdiction over the California parent. See *Graco*, 558 F. Supp. at 190-91, citing *Cannon*, 267 U.S. 333, 69 L. Ed. 634, 45 S. Ct. 250. The appellate court indicated that despite the defendant's urging, it would not rely on *Cannon*, because that case "was decided more than 20 years prior to *International Shoe* [citation], the decision in which the focus of the [United States Supreme Court] on jurisdictional questions shifted from a defendant's 'presence' in the forum State to his 'minimum contacts' therewith." *Maunder*, 112 Ill. App. 3d at 883, 445 N.E.2d at 1306. "Consequently, *Cannon* merely purports to hold that conducting business through a wholly owned subsidiary does not necessarily render the parent corporation amenable to process in the State where the subsidiary does business." *Maunder*, 112 Ill. App. 3d at 883-84, 445 N.E.2d at 1306. The supreme court remarked, "Although *Cannon* has not been expressly overruled, its vitality has been limited by the

subsequent decisions in *International Shoe* and its progeny. [Citations.] Many commentators have noted that the *Cannon* opinion is no longer followed in an era when the United States Supreme Court focuses on 'contacts' rather than 'physical presence' in determining the scope of State court jurisdiction over nonresident defendants. [Citations.]" *Maunder*, 102 Ill. 2d at 353, 466 N.E.2d at 222. Furthermore, this was not the first time the Illinois Supreme Court indicated that Illinois courts do not rely on *Cannon* or its progeny. Six years earlier, in *Beech Aircraft*, the court remarked that the United States Supreme Court had recently reviewed the pertinent authorities dating as far back as 1878, a date well before the 1925 *Cannon* decision or 1945's *International Shoe,* and had "concluded that the standards elucidated in *International Shoe* *** continue[ ] to be the test of a State's jurisdiction over a foreign corporation." *Beech Aircraft*, 72 Ill. 2d at 553, citing *Shaffer*, 433 U.S. 186, 53 L. Ed. 2d 683, 97 S. Ct. 2569. Even *Graco* acknowledged that some courts have criticized the *Cannon* analysis and prefer to rely on state statutes and constitutional due process to determine whether jurisdiction exists over a nonresident parent corporation. *Graco*, 558 F. Supp. at 191. In fact, after applying the *Cannon* factors (*Graco*, 558 F. Supp. at 190-91), the *Graco* court engaged in a separate analysis of its defendant's activities under the "doing business" doctrine as stated in *Cook Associates*, 87 Ill. 2d 190, 429 N.E.2d 847, a case cited extensively above, and another Illinois case that is specific to products liability. *Graco*, 558 F. Supp. at 192-93. We also note that *Graco*, 558 F. Supp 188, is a lower federal court case. It was presented by the Riemers in opposition to the motion to quash service and dismiss based on lack of personal jurisdiction. However, lower federal court decisions are at best persuasive rather than binding on Illinois state courts (*People ex rel. Ryan v. World Church of the Creator*, 198 Ill. 2d 115, 127, 760 N.E.2d 953, 960 (2001)), and as discussed above, Illinois has declined to adopt a precise test for determining whether a foreign corporation is doing business in Illinois. For these reasons, the trial judge's almost exclusive reliance on the *Cannon* factors was misplaced. For these same reasons, we decline to address the extensive written and oral arguments the parties offer this court regarding *Cannon*'s application to their dispute.

■ Finally, our *de novo* review of the business contacts between defendant and the State of Illinois leads us to conclude that defendant did not have sufficient contacts to warrant invocation of personal jurisdiction by an Illinois court. The contacts to be reviewed span between August 1999, when Marilyn Riemer was purportedly struck and injured in California by the resort's falling mirror, and the last

three months of 2000, when suit was filed and service was accomplished in Illinois. The record discloses that the California parent was not engaged in a pattern of permanent and continuous activities in Illinois during that time frame. Its only contacts with Illinois were through the presence of Gydesen, an Illinois resident, and Internet webpages that were accessible in Illinois. Gydesen was an employee of one of defendant's sub-subsidiary corporations, the Virginia-based KSL Resorts Group, which functioned strictly as a solicitation arm for the six out-of-state resorts. She worked from her private residence, rather than from an office open to the public, and she initiated contacts with Midwest business groups or associations through targeted means such as direct calls and trade shows rather than to the general public through radio and television broadcasts, newspapers, or telemarketing. Only two of the four trade shows she attended were in Illinois. Her permanent base in Illinois made her presence more significant than the transient trade show attendance in cases such as *Cook Associates*, 87 Ill. 2d 190, 429 N.E.2d 847, *Radosta*, 172 Ill. App. 3d 289, 526 N.E.2d 561, and *Dal Ponte*, 220 Ill. App. 3d 878, 581 N.E.2d 329; however, she merely solicited potential clients to enter into contracts with representatives of the six out-of-state resorts. She did not execute any contracts, nor, for that matter, did anyone else who worked for the Virginia-based sub-subsidiary that employed her. The agreements were executed by resort personnel outside Illinois and the agreed-upon services were provided by resort personnel outside Illinois. The Internet sites maintained by her Virginia-based employer and the six out-of-state resorts were simply additional means of enticing potential clients to contract with resort personnel outside of Illinois. *Forrester*, 336 Ill. App. 3d at 581, 784 N.E.2d at 840. In other words, Gydesen's activities and the webpages were mere solicitation comparable to or even less than the advertising and trade show attendance that was considered insufficient in the four cases just cited to establish that foreign entities were doing business in Illinois. We could end our analysis here with the conclusion that the quality and nature of the activities in Illinois—mere solicitation—were not enough to constitute doing business in the forum. However, in addition to the very limited quality and nature of the activity in Illinois, there is absolutely no suggestion that it amounted to doing the business of the California parent.

In contrast to *Maunder* or *Alderson*, there is no evidence that Gydesen's activities or the Internet sites were essential components of the California parent's business or were controlled by the California parent. The record shows the parent specialized in acquiring resort properties and the surrounding real estate, but after it acquired these

assets, it relinquished their direct ownership and operation by selling the properties to other KSL corporations. The subsidiary KSL Recreation Group and the sub-subsidiaries, such as the one running the Claremont, were in the business of owning and operating the six resorts. Gydesen worked for a separate sub-subsidiary that solicited business for all of the resorts. It appears then that her solicitation activities benefitted and were on behalf of the various sub-subsidiaries that actually owned and operated the facilities and the subsidiary that claimed the resulting income in its Form 10—K Annual Report, KSL Recreation Group. Arguably her efforts were a component of the business at that intermediate level. It is questionable, however, whether her solicitation efforts were an "essential component" of business at that intermediate level. More important, we cannot conclude Gydesen's efforts in Illinois to solicit convention groups to stay at the various out-of-state resort properties were essential to the California parent's business of acquiring the properties. In fact, the record does not show that any of the activity at the sub-subsidiary level, whether it was Gydesen's in-person, telephone, trade show, or mail solicitation, Internet solicitation, or ownership and operation of the properties, was essential to the parent's business of acquiring the properties. The record also fails to show that the parent exerted any control over Gydesen's solicitation activities. In other words, in contrast to both *Maunder* and *Alderson*, there is no evidence that the local office was conducting the parent's business, or put another way, that the parent was doing business through the local office. Facts that the Riemers now rely upon do not indicate that the local sub-subsidiary or even the intermediate subsidiary was controlled by the parent corporation. The Riemers couch these facts in terms of the *Cannon* factors. Nevertheless, to the extent they rely on these facts as indications that the parent was doing business in Illinois, we conclude that their reliance is misplaced. The Riemers point out, for example, that the intermediate subsidiary's Form 10—K disclosed the various KSL corporations were part of a tax-sharing agreement and that they consolidated their tax returns in order to take advantage of certain tax laws. Although the Riemers consider this fact significant, we do not, because combining financial data for tax purposes is not an indication that the defendant parent corporation managed or oversaw the day-to-day operations in Illinois. Furthermore, it did not negate or contradict Lichliter's specific sworn assertions that the local sub-subsidiary kept independent financial records, paid its own taxes, and was not controlled by the defendant parent corporation. The Riemers also point out that the Form 10—K itself provided "Consolidated Statements of Operations" and that an explanatory note in the report indicated that "intercom-

pany transactions and balances have been eliminated" in those statements. As summarized above, the report filed by the intermediate subsidiary may have blurred the distinctions between itself and its 26 subsidiaries but it consistently distinguished the parent corporation as a separate and distinct entity. We do not read the intermediate subsidiary's actions or remarks about itself and its various subsidiaries as indicators that its parent corporation subsumed any subentity into any of its own financial records. Neither the multicorporation tax sharing arrangement nor the intermediate subsidiary's Form 10K filing refuted the sworn statement that the sub-subsidiary at issue maintained a distinct financial identity from the parent corporation and was not controlled by the parent. The Riemers also attach great significance to the expense allocation agreement between the defendant parent and the intermediate subsidiary KSL Recreation Group, indicating that, if requested, the parent would provide any of the various subsidiaries with management and advice and use of the parent's resources. The fact that there was an agreement to that effect tells us nothing about the actual relationship between the California and Illinois entities. Although not argued by the Riemers, the Form 10—K specified that a substantial amount of fees had been paid to the parent during the relevant time period as a result of this agreement—$9.8 million in 1999, and $10.7 million in 2000. However, as noted earlier, the Form 10—K did not specify whether the intermediate subsidiary, one of its 26 sub-subsidiaries, or a combination of those 27 entities, had obtained the parent's assistance. Furthermore, any general inference that might have been drawn in favor of the Riemers on the basis of this information was negated by Lichliter's specific sworn statement that the California parent did not control the Illinois office. The Riemers also point to the fact that the California parent and Virginia sales sub-subsidiary had substantially the same directors and key executive officers. This fact alone does not demonstrate that the California parent controlled the activities in Illinois and it is not enough to confer jurisdiction over the nonresident parent. *Alderson*, 321 Ill. App. 3d at 854, 747 N.E.2d at 944. Furthermore, even in the aggregate, the facts emphasized by the Riemers do not demonstrate the local activities were controlled by the defendant parent corporation.

We conclude that the defendant parent corporation's contacts with Illinois were limited to mere solicitation by a sub-subsidiary that was officed in Illinois and sub-subsidiaries' Internet sites that were accessible in Illinois, which were not controlled by the defendant parent corporation. These contacts were an insufficient basis for concluding that defendant was doing business in Illinois through any sub-

44

subsidiary and therefore subject to the personal jurisdiction of our courts. We find, accordingly, that defendant's motion to quash service of process and dismiss plaintiffs' complaint based on lack of personal jurisdiction should have been granted, and we reverse the trial judge's order denying the motion.

Reversed.

CAHILL and GARCIA, JJ., concur.